**SOCIETY OF THE SISTERS OF THE HOLY NAMES OF JESUS AND MARY v. PIERCE, Governor of Oregon, et al.**

**HILL MILITARY ACADEMY v. SAME.**

(District Court, D. Oregon. March 31, 1924.)

Nos. 8660, 8662.

1. **Constitutional law** ⟨⇒⟩210, 252—**Corporations entitled to protection of due process and equal protection clauses.**

Though civil, religious, and educational corporations are not possessed of the rights of citizens under privileges and immunities clause of Const. Amend. 14, they cannot be deprived of their property without due process of law nor be denied the equal protection of the laws.

2. **Injunction** ⟨⇒⟩16—**Violation of constitutional right enjoined, in absence of plain, speedy, and adequate remedy at law.**

Equity has jurisdiction to give relief against the violation or infringement of a constitutional right, privilege, or immunity, threatened or active, to the detriment or injury of a complainant, unless such party has a plain, speedy, and adequate remedy at law.

3. **Injunction** ⟨⇒⟩85(2)—**State officers enjoined from enforcing state law contravening federal Constitution.**

Equity may, in proper cases, restrain state officers, clothed with authority for enforcing the laws, from the threatened enforcement of a state law which contravenes the federal Constitution, wherever it is essential in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable.

4. **Constitutional law** ⟨⇒⟩42—**Complainant may insist that others on whom he is dependent for support and sustenance shall not be deprived of constitutional rights.**

A party, insisting that constitutional guaranties for his benefit are being violated, may also insist as an element of infringement of such guaranties, that others on whom he is dependent for support and suste-

---

⟨⇒⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

nance of his lawful business, shall not be deprived of their constitutional rights, privileges, and immunities.

5. **Constitutional law ⬅255, 274, 278(1)—State statute requiring children to attend public schools held violative of due process clause.**

Or. L. § 5259, as amended by Laws 1923, p. 9, requiring children between 8 and 16 years of age to attend public schools, *held* denial of the right of parochial and private schools to operate, and of the right of parents and guardians to send their children and wards to such schools as they may desire, contravening due process clause.

6. **Injunction ⬅85(2)—Enforcement of unconstitutional act enjoined before act takes effect.**

Enforcement of Or. L. § 5259, as amended by Laws 1923, p. 9, requiring children of certain ages to attend public schools, void because violative of Const. Amend. 14, will be enjoined, though act will not take effect until more than two years in the future.

7. **Equity ⬅46—Rule as to "adequacy of remedy at law" to deprive equity of jurisdiction stated.**

The remedy at law, to deprive equity of jurisdiction, must not only be plain, speedy, and adequate, but must be as adequate, complete, practical, and efficient to meet the ends of justice as the remedy in equity.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Adequate Remedy.]

8. **Constitutional law ⬅67—May amplify remedies and apply rules for advancement of justice.**

Courts may amplify remedies and apply rules and general principles for the advancement of substantial justice.

9. **Injunction ⬅1—In use of writ, court must exercise sound and legal discretion.**

The court, in the use of the writ of injunction, must exercise a sound and legal discretion, regulated by analogy, and what would be manifestly just, in view of all the existing conditions.

10. **Injunction ⬅85(2)—Party affected by unconstitutional act need not wait until step is taken affecting him injuriously before obtaining preventive relief.**

A party affected by an unconstitutional act need not wait until some step is taken under the act that would affect him injuriously, since one does not have to wait the consummation of threatened injury to obtain preventive relief.

11. **Schools and school districts ⬅160—Statute requiring children to attend public schools held not a valid exercise of police power.**

Or. L. § 5259, as amended by Laws 1923, p. 9, requiring children of certain ages to attend public schools, *held* not valid as an exercise of the police power of the state.

12. **Constitutional law ⬅81—In exercise of police power, state may enact laws relating to safety, health, morals, and general welfare of public.**

The state in its sovereign capacity may, in the exercise of police powers, enact laws relating to the safety, health, morals, and general welfare of the public.

13. **Constitutional law ⬅81—Limitation to state's exercise of police power stated.**

The state cannot exercise its police powers arbitrarily and despotically, nor unless there exists a reasonable relation between the character of the legislation and the policy to be subserved.

14. **Constitutional law ⬅45, 70(3)—Rule as to court's review of acts enacted by state Legislature in exercise of police power stated.**

The state Legislature is not the final judge of limitations of the police power, but its enactment will be set aside when found to be an unwarranted, arbitrary interference with the constitutional right to carry on a lawful business or occupation, and to use and enjoy property; but the courts may not interfere merely because they differ from the Legislature in its views of public policy, or propriety of the legislation in question, unless the act is unmistakably and palpably in excess of legislative power.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suits by the Society of the Sisters of the Holy Names of Jesus and Mary, an educational corporation, and by the Hill Military Academy, a corporation, against Walter M. Pierce, as Governor of the State of Oregon, and others. Motions to dismiss denied, and preliminary injunctions issued.

The plaintiff in the first of the above cases, hereafter for convenience to be called the Sisters' Society, was incorporated, and now maintains its corporate powers, under the general laws of Oregon providing for the incorporation of religious, literary, and charitable societies, and the plaintiff in the second case, to be called the Academy, was incorporated under the general laws providing for the incorporation of private corporations, and is maintaining its school under and by virtue of such organization. Among the powers assumed by the Sisters' Society is "the care of orphans and the education and instruction of youth, and to establish and maintain academies or schools for the care and education of youth in the cities and towns of the state of Oregon," and among those assumed by the Academy, "to conduct a military academy and school."

Each of these institutions teaches the primary or grammar grades, including children ranging from 8 to 16 years of age. Each has been in existence for many years, and has built up and acquired an extensive patronage and attendance, and owns real and personal property of great value, including equipment and laboratories for enabling it to maintain its school work, and each carries primary students through the eight grades of instruction required to be taught in the common schools and under the supervision of the school authorities of the state. While this is true, each of these institutions engages in other lines of school work, one extending to religious and the other to military and other instruction, and their principal sources of sustenance are from tuition paid by student bodies.

There was enacted, under the initiative, on November 7, 1922, a bill for the amendment of section 5259, Oregon Laws, which reads as follows:

"*Children Between the Ages of Eight and Sixteen Years.*—Any parent, guardian or other person in the state of Oregon, having control or charge or custody of a child under the age of sixteen years and of the age of eight years or over at the commencement of a term of public school of the district in which said child resides, who shall fail or neglect or refuse to send such child to a public school for the period of time a public school shall be held during the current year in said district, shall be guilty of a misdemeanor and each day's failure to send such child to a public school shall constitute a separate offense; provided, that in the following cases, children shall not be required to attend public schools." Laws 1923, p. 9.

Among the cases are children who have completed the eighth grade. It is alleged, in effect, in each of these cases, that the defendants do now publicly declare and publish that the act is valid, wise, and wholesome; that they threaten and declare that they will enforce all the provisions thereof from and after the date it becomes operative, and that all parents and guardians having children between the ages of 8 and 16 years to nurture, support, and educate, who shall send them to plaintiffs' grade schools after that date, will be prosecuted as violators of the act; that by reason thereof patrons are withdrawing their children from plaintiffs' schools and depleting their attendance; that, if the process continues, as it assuredly will, complainants will be deprived of their entire patronage in the grade courses, the school systems in which they have been engaged will in large measure be destroyed, and they will be compelled to discontinue and close all their schools long before the act goes into effect; that the value of their property is being depreciated, and it will be rendered practically worthless for school or other purposes.

These suits are instituted to have the act declared void, as in contravention of the constitutional rights and privileges of plaintiffs, and to restrain defendants from insisting upon its validity, now or at any time. Plaintiffs claim that the act is void, as violative of section 1 of the Fourteenth Amend-

ment of the Constitution, in that it trenches upon their privileges and immunities as citizens of the United States; that it deprives them of life, liberty, and property without due process of law, and the equal protection of the laws, and is violative also of that clause of section 10, art. 1, of the Constitution, relating to the impairment of the obligation of contracts. Complainants are asking for injunctive relief. Defendants have interposed motions to dismiss.

Bowerman & Kavanaugh, Malarkey, Seabrook & Dibble, Emmons & Lusk, and Frank J. Lonergan, all of Portland, Or., for plaintiff Society of the Sisters of the Holy Names of Jesus and Mary,

John C. Veatch, of Portland, Or., for plaintiff Hill Military Academy.

I. H. Van Winkle, Atty. Gen., of Salem, Or., and Stanley Myers, Dist. Atty., and McCamant & Thompson, all of Portland, Or., for defendants.

Before GILBERT, Circuit Judge, and WOLVERTON and BEAN, District Judges.

WOLVERTON, District Judge (after stating the facts as above).
[1] Without refining as to the precise political rights that corporations, whether civil, religious, or educational, have and possess, and of right may assert and maintain, in this country, it is sufficient to say that it has been recognized by ample authority that, while not possessing the rights of citizens under the privileges, and immunities clause of the Fourteenth Amendment to the Constitution (Waters-Pierce Oil Co. v. Texas, 177 U. S. 28, 45, 20 Sup. Ct. 518, 44 L. Ed. 657), they do have the guaranty, along with citizens, that they shall not be deprived of their property without due process of law, nor be denied the equal protection of the laws (Smyth v. Ames, 169 U. S. 466, 526, 18 Sup. Ct. 418, 42 L. Ed. 819; Covington, etc., Turnpike Co. v. Sandford, 164 U. S. 578, 592, 17 Sup. Ct. 198, 41 L. Ed. 560; Gulf, Colorado & Santa Fé Railway Co. v. Ellis, 165 U. S. 150, 154, 17 Sup. Ct. 255, 41 L. Ed. 666; Southern Railway Co. v. Greene, 216 U. S. 400, 416, 30 Sup. Ct. 287, 54 L. Ed. 536, 17 Ann. Cas. 1247).

[2, 3] The question as to equitable jurisdiction is a simple one, and it may be affirmed that, without controversy, the jurisdiction of equity to give relief against the violation or infringement of a constitutional right, privilege, or immunity, threatened or active, to the detriment or injury of a complainant, is inherent, unless such party has a plain, speedy, and adequate remedy at law; and in the exercise of such jurisdiction, the court may, in proper cases, restrain state officers, clothed with authority for enforcing the laws, from the threatened enforcement of a state law which contravenes the federal Constitution, wherever it is essential in order effectually to protect property rights and the rights of persons against injuries otherwise irremediable. Terrace et al. v. Thompson, 44 Sup. Ct. 15, 68 L. Ed. ——, and cases there cited.

[4] Further than this, a party insisting that constitutional guaranties for his benefit are being violated, may also insist, as an element of infringement of such guaranties, that others upon whom he is dependent for the support and sustenance of his lawful business shall not be deprived of their constitutional rights, privileges, and immunities.

Thus, in Truax v. Raich, 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283, it appears that, under an act passed by the Legislative Assembly of Arizona, employers were prohibited, under penalty, from employing aliens to the extent of more than 20 per cent. of their working force. Mike Raich, an alien employee, feeling himself aggrieved, instituted a suit against his employer and the district attorney of the proper county, to restrain the enforcement of the act. It was urged, among other things, that the servant ought not to be heard to complain for his master, who alone was subject to prosecution. But the court answered:

"The act undertakes to operate directly upon the employment of aliens, and if enforced would compel the employer to discharge a sufficient number of his employees to bring the alien quota within the prescribed limit. It sufficiently appears that the discharge of the complainant will be solely for the purpose of meeting the requirements of the act and avoiding threatened prosecution under its provisions. It is therefore idle to call the injury indirect or remote."

The pertinency of the court's conclusion is the more manifest in view of its previous declaration, as a premise, that the—

"employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion, and, by the weight of authority, the unjustified interference of third persons is actionable, although the employment is at will."

Likewise, in Terrace et al. v. Thompson, Attorney General of the State of Washington, supra, which was a suit to enjoin the enforcement of the anti-alien land law of that state, it appears that the Terraces and one Nakatsuka, a Japanese and an alien, were desirous of entering into a lease of realty belonging to the former. Against the contention of the Attorney General that the parties had an adequate remedy at law, the court replied among other things:

"The owners have an interest in the freedom of the alien, and he has an interest in their freedom, to make the lease. The state act purports to operate directly upon the consummation of the proposed transaction between them, and the threat and purpose of the Attorney General to enforce the punishments and forfeiture prescribed prevents each from dealing with the other."

The same principle is directly involved, though not discussed, in the case of Nebraska District of Evangelical Lutheran Synod v. McKelvie et al., 262 U. S. 404, 43 Sup. Ct. 628, 67 L. Ed. ——, read in connection with Meyer v. Nebraska, 262 U. S. 390, 43 Sup. Ct. 625, 67 L. Ed. 1042.

[5] To make the application here, the complainants in the instant cases have an interest in the parents and guardians of children of school age, and in the protection of their constitutional rights and liberties, and such parents and guardians have an interest in the constitutional rights of complainants to see that their schools may be maintained for the mutual use and benefit of the parties concerned. Thus the field of inquiry is broadened, and pertains, not only to whether the complainants' constitutional rights are affected adversely by the act in controversy, but to whether the constitutional rights of the parents and guardians are also adversely affected, for, if they are so affected, com-

plainants will be deprived, nevertheless, of the advantage of patrons with legal right and privilege of providing school attendance. In other words, the schools will be affected adversely, if the act is unconstitutional, whether it be by reason of an invasion of the patrons' constitutional rights and privileges, or of an invasion of plaintiffs' inherent rights, or both. Indeed, the very pith of complainants' contention is that they cannot maintain their schools, if their patronage is taken away by making it unlawful for parents and guardians to send their children to complainants' schools.

It can scarcely be contended that complainants' right to carry on their schools, whether parochial or private, is not a property right, and the right of parents and guardians to send their children and wards to such schools as they may desire, if not in conflict with lawful requirements, is a privilege they inherently are entitled to enjoy. Meyer v. Nebraska, supra, and Nebraska District of Evangelical Lutheran Synod v. McKelvie et al., supra, seem to affirm the propositions. See, also, C., M. & St. Paul R. R. Co. v. Wisconsin, 238 U. S. 491, 35 Sup. Ct. 869, 59 L. Ed. 1423, L. R. A. 1916A, 1133; Adkins et al. v. Children's Hospital and Adkins et al. v. Lyons (Nos. 795, 796) 261 U. S. 525, 43 Sup. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238.

[6, 7] One of the searching questions involved by the controversy is whether the causes have been prematurely brought. It will be noted that the act complained against is to become effective on and after the 1st day of September, 1926, more than 2 years and 5 months hence. This presents one of the elements which must be considered, along with the rest, for ascertaining and determining whether, under the showing made, the complainants, or either of them, are meeting with irreparable and irremediable injury, which may not be as speedily and adequately met by such remedies as the law side of the court may afford. The principle that the remedy at law, if relied upon to supplant the equitable jurisdiction, must not only be plain, speedy, and adequate, but as adequate, complete, practical, and efficient to meet the ends of justice as that in equity, is so well settled as to need no citation of authorities. See, however, Terrace v. Thompson, supra.

It is at once obvious that, in the very nature of the upbuilding and maintenance of parochial and private schools, when the attendance, prospective as well as acquired, is taken away or rendered unlawful, it will destroy the pursuit or occupation. If school buildings have been constructed, and equipment purchased and provided, without school attendance such property must lapse into disuse, and become of no value for the purposes for which it was designed, and, of course, an irreparable loss will ensue—the paramount loss of school attendance, and a damage and practical destruction, especially for school purposes, of the school property.

Now, although the time at which the act is to become effective is somewhat remote, it is quite apparent, from the allegations of the bills, the work of destruction of complainants' occupation has already set in. They are losing their patronage, traceable directly to the fact that the act is a statute duly adopted and promulgated. Parents are looking to the future, and are laying their plans to meet the exigencies to arise.

The curriculum of the grade schools requires several years of attendance, and, if parents must, on the taking effect of the statute, send to the public schools, many of them are prepared to do so now, or as convenience may suggest. Hence the drawing away of complainants' patronage has set in, and will continue with increased progression until the day when all will be lost. This is not only the alleged result of the passage of the act, but it is the most natural and consequential thing to expect. The damage, of course, is irreparable, and compensation does not afford adequate relief. The injury being of a quality that is continuous and accelerating, it must be stayed if the ends of justice are to be met.

Nor is it an answer to the dilemma that the act may be repealed before it becomes operative, or that ample opportunity is afforded for the people or the Legislature to amend it, so as to present a radically different question from that now involved. In all probability its provisions will remain as they now are until they become operative and the damage is done, for it is not usual to amend or repeal statutes, at least until their effect has been tested. The very purpose of placing the effective date so far' ahead was to give ample time for the parochial and private schools to adjust themselves to the new conditions, which is really a confession on the part of the law givers that such schools are going to be hurt, and that seriously, if not irreparably. It must be true, as expressed by Mr. Justice Brewer while sitting in the Circuit Court of Nebraska:

"That the powers of a court of equity are as vast, and its processes and procedure as elastic, as all the changing emergencies of increasingly complex business relations and the protection of rights can demand"—quoted in Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co. (C. C.) 54 Fed. 746, 751, 19 L. R. A. 395.

[8] That the writ may be novel, or is without precedent, is not a fatal objection to its use, for the jurisdiction of a court of equity depends—

"rather upon the necessities of mankind, and the great principles of natural justice, which are recognized by the courts as a part of the law of the land, and which are applicable alike to all conditions of society, all ages, and all people." Dodge v. Cole, 97 Ill. 338, 364 (37 Am. Rep. 111).

"Courts may amplify remedies and apply rules and general principles for the advancement of substantial justice." 32 Corpus Juris, p. 34, § 13.

[9] Of course, in the use of the writ of injunction, the court must exercise a sound and legal discretion, regulated by analogy, and by what would be manifestly just, in view of all the existing conditions.

[10] It cannot be questioned that a party affected by an unconstitutional act need not wait until some step is taken, under the act, that would affect him injuriously. "One does not have to await the consummation of threatened injury to obtain preventive relief." Pennsylvania v. West Virginia, 262 U. S. 553, 43 Sup. Ct. 658, 67 L. Ed. 1117. See, also, Vicksburg Waterworks Co. v. Vicksburg, 185 U. S. 65, 22 Sup. Ct. 585, 46 L. Ed. 808, where the court says:

"But it is one of the most valuable features of equity jurisdiction, to anticipate and prevent a threatened injury, where the damages would be insufficient or irreparable. The exercise of such jurisdiction is for the benefit of both

parties; in disclosing to the defendant that he is proceeding without warrant of law, and in protecting the complainant from injuries which, if inflicted, would be wholly destructive of his rights."

See, further, Detroit Creamery Co. v. Kinnane (D. C.) 264 Fed. 845, affirmed 255 U. S. 102, 41 Sup. Ct. 304, 65 L. Ed. 531.

The case of Terrace v. Thompson, supra, is one where, though the act was effective, there was no violation thereof by the parties concerned. Yet a suit to enjoin its enforcement was sustained, on the ground that a violation of the act would subject the offenders to the penalty subjoined. Nor are we without precedent for the application of injunctive relief, even prior to the time when the statute becomes effective. Palatka Waterworks v. City of Palatka (C. C.) 127 Fed. 161. And Davenport v. Kleinschmidt, 6 Mont. 502, 13 Pac. 249, seems to be of like character.

However, considering that injunctive relief is appropriate to prevent threatened or impending irreparable injury and damage to one's property rights, it can hardly be further urged that it is inapplicable here because the suits were prematurely instituted. The present bills of complaint show, not only a threat to enforce the act when it becomes effective, but that complainants are suffering irremediable injury now, which will continue with increasing detriment and damage until their principal occupations are destroyed and they are deprived of their property and property rights. We think the suits were not prematurely brought.

[11, 12] It is not denied that the state, in its sovereign capacity, is entitled to the exercise of what are termed police powers. What these powers are the courts have not attempted to define precisely. But, without question, they relate to the safety, health, morals, and general welfare of the public. "Both property and liberty," says the court, in Lochner v. New York, 198 U. S. 45, 53, 25 Sup. Ct. 539, 541 (49 L. Ed. 937, 3 Ann. Cas. 1133), "are held on such reasonable conditions as may be imposed by the governing power of the state in the exercise of those powers, and with such conditions the Fourteenth Amendment was not designed to interfere."

[13, 14] But there is a limit to the manner in which these powers may be exercised by the state. They cannot be exercised arbitrarily and despotically, nor unless there exists a reasonable relation between the character of the legislation and the policy to be subserved. Nor is the state Legislature the final judge of the limitations of the police power. Its enactments will be set aside when found to be unwarranted and arbitrary interference with rights protected by the Constitution in carrying on a lawful business or occupation in the use and enjoyment of property. In other words, the exercise of the police power is subject to judicial review, and property rights cannot be ruthlessly destroyed by wrongful enactment. Silz v. Hesterberg, 211 U. S. 31, 39, 29 Sup. Ct. 10, 53 L. Ed. 75; Lawton v. Steele, 152 U. S. 133, 137, 14 Sup. Ct. 499, 38 L. Ed. 385; Dobbins v. Los Angeles, 195 U. S. 223, 239, 25 Sup. Ct. 18, 49 L. Ed. 169.

In elaboration of the principle, the courts may not, however, because of the mere fact that they differ from the Legislature in its views of

public policy, or hold views inconsistent with the propriety of the legislation in question, interfere judicially, nor unless the act in question is unmistakably and palpably in excess of legislative power. McLean v. Arkansas, 211 U. S. 539, 547, 29 Sup. Ct. 206, 53 L. Ed. 315.

There are certain known callings and occupations that the state may, under and in pursuance of its police powers, regulate by reasonable interposition; but it cannot prohibit their exercise, where to do so will infringe the guaranties of the Fourteenth Amendment. Thus employment agencies may be regulated, but not prohibited. Adams v. Tanner, 244 U. S. 590, 37 Sup. Ct. 662, 61 L. Ed. 1336, L. R. A. 1917F, 1163, Ann. Cas. 1917D, 973. The right of the individual to work and earn a livelihood may not be prohibited, though the workman be an alien. Truax v. Raich, supra.

The right to contract in relation to one's business is a liberty that may not be inhibited without entrenchment upon rights guaranteed by the Fourteenth Amendment. Lochner v. New York, supra; Adkins et al. v. Children's Hospital, supra. The right to engage in a useful, legitimate business, not harmful or vicious, is protected under the amendment, and cannot be abrogated. Murphy v. California, 225 U. S. 623, 32 Sup. Ct. 697, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153. And the right to teach German along with the grammar school grades may not be impinged upon under the guise of legislative regulation. Meyer v. Nebraska, supra.

No one questions the proposition that our public schools are subject to a reasonable supervision of the state through its Legislature, in the exercise of its police powers, for safeguarding the health, morals, and general weal of the public. Nor is it disputed that, while parents possess a natural and inherent right to the nurture, control, and tutorship of their offspring, that they may be brought up according to the parents' conception of what is right and just, decent, and respectable, and manly and noble in life, the state yet stands in the position of parens patriæ to, and may exercise its just powers "in preparing the child, in future life, to support itself, to serve the state and in all the relations and duties of adult life to perform well and capably its part." People v. Ewer, 141 N. Y. 129, 133, 36 N. E. 4, 25 L. R. A. 794, 38 Am. St. Rep. 788; State v. Shorey, 48 Or. 396, 399, 86 Pac. 881, 24 L. R. A. (N. S.) 1121.

The test here is not as to these primordial and long-established principles, and they are referred to only for clarifying the atmosphere, so that we may proceed intelligently to a discussion of the very crux of the cases at bar. The real test is: Has the state, through its legislative functions, the power, under the guise of police regulation, to deprive parochial and private school organizations of the liberty and right to carry on their schools for teaching in the grammar grades?

The act could not be more effective for utterly destroying the business and occupation of complainants' schools, except, perhaps, the college and higher preparatory grades, if it had been entitled "An act to prevent parochial and private schools from teaching the grammar grades." This serves to emphasize the seriousness of the controversy. Indeed, the simile is no stronger than the argument for the adoption

of the measure put it: "A divided school can no more succeed than a divided nation." That such is the purpose of the act is obvious and incontrovertible.

It cannot be successfully combated that parochial and private schools have existed almost from time immemorial—so long, at least, that their privilege and right to teach the grammar grades must be regarded as natural and inherent, as much so as the privilege and right of a tutor to teach the German language with the grammar grades, as was held in Meyer v. Nebraska, supra. The absolute right of these schools to teach in the grammar grades (paraphrasing somewhat the language of the court in the case just cited), and the right of the parents to engage them to instruct their children, we think, is within the liberty of the Fourteenth Amendment.

The right of the state to establish as its school policy compulsory education within its boundaries is conceded. Practically all the states in the Union have adopted such a policy, and no one disputes its utility for reducing illiteracy and raising the standard of citizenship. But no state has ventured so far as to eliminate parochial and private schools from participating in the promotion of the policy.

Compulsory education being the paramount policy of the state, can it be said, with reason and justice, that the right and privilege of parochial and private schools to teach in the common school grades is inimical or detrimental to, or destructive of, that policy? Such schools and their patrons have the same interest in fostering primary education as the state, and appropriate regulation will place them under supervision of school authorities so they will not escape the duty of proper primary instruction. No one has advanced the argument that teaching by these schools is harmful, or that their existence with the privilege of teaching in the grammar grades is a menace, or of vicious potency, to the state or the community at large, and there appears no plausible or sound reason why they should be eliminated from taking part in the primary education of the youth. It would seem that the act in question is neither necessary nor essential for the proper enforcement of the state's school policy.

The court in the Meyer Case, in stating some things that are without doubt included by the term "liberty" as guaranteed by the Constitution, concludes:

"And generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."

And further on the court says (allusion to which has been previously made):

"Plaintiff in error taught this [German] language in school as part of his occupation. His right thus to teach, and the right of parents to engage him so to instruct their children, we think, are within the liberty of the amendment."

These declarations, although they speak of the individual, are applicable here, notwithstanding complainants are bodies corporate. Their right and privilege to teach the grammar school grades, and the privilege of parents to employ them, are the same as though the individual were

conducting a private school along the same lines. The mere fact that they bear corporate names affords no basis for distinguishing them from private schools, conducted by an individual or individuals, with a corps of teachers and instructors to carry on the school work. "The established doctrine is,' continues the court, "that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect."

The melting pot idea, applied to the common schools of the state, as an incentive for the adoption of the act, is an extravagance in simile. A careful analysis of the attendance of children of school age, foreign-born and of foreign-born parentage, at private schools, as compared with the whole attendance at schools, public and private, would undoubtedly show that the number is negligible, and the assimilation problem could afford no reasonable basis for the adoption of the measure. But if it be that the incentive is political, and arises out of war exigencies and conditions following thereupon, then the assimilation idea is pointedly answered by the opinion rendered in the Meyer Case:

"The desire of the Legislature to foster a homogeneous people, with American ideals, prepared readily to understand current discussions of civic matters is easy to appreciate. Unfortunate experiences during the late war and aversion toward every character of truculent adversaries were certainly enough to quicken that aspiration. But the means adopted, we think, exceed the limitations upon the power of the state and conflict with rights assured to plaintiff in error."

So it is here, in our opinion, the state, acting in its legislative capacity, has, in the means adopted, exceeded the limitations of its power—its purpose being to take utterly away from complainants their constitutional right and privilege to teach in the grammar grades—and has and will deprive them of their property without due process of law.

Other questions have been presented, but, their decision not being necessary to a determination of the controversy involved, they are not considered.

The motions to dismiss will be denied, and preliminary injunctions will issue, restraining the defendants from threatening or attempting to enforce the act complained against.