**HARRIS STANLEY COAL & LAND CO. et al. v. CHESAPEAKE & O. RY. CO.**

**CHESAPEAKE & O. RY. CO. v. HARRIS STANLEY COAL & LAND CO. et al.**

Nos. 9987, 9988.

Circuit Court of Appeals, Sixth Circuit.

April 3, 1946.

C. W. Napier and B. P. Wooten, both of Hazard, Ky., for appellants and cross-appellees.

LeWright Browning, of Ashland, Ky., for appellee and cross-appellant.

Before SIMONS, MARTIN and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

The principal question in these appeals is whether a case had been made by the railroad for the granting to it of a permanent injunction. It sought to restrain certain operations by the coal company in its mine adjacent to the railroad right-of-way, the operations being alleged to threaten injury to the property of the railroad and to constitute a hazard to the freight and passenger traffic moving over its line. A temporary injunction pending consideration of the merits, was earlier granted but later dissolved. Upon full hearing a permanent injunction was refused and a counterclaim by the coal company for damages to its mine through removal of lateral support in the construction of the railroad in 1905 and the later removal of the railroad siding, was dismissed. No. 9987 is the coal company's appeal from the dismissal of its counterclaim; No. 9988 is the railroad's appeal from the denial of a permanent injunction.

The coal mine is in mountainous country on the west bank of the Big Sandy River, opposite the city of Prestonsburg, in Floyd County, Kentucky. Between it and the Levisa branch of the Big Sandy, and from 50 to 100 feet below the projected operations, lie the tracks of a branch line running from Ashland, Kentucky, to Elkhorn City, Kentucky, a distance of 130 miles, and serving the public as a transportation facility for both passengers and freight. This line was built upon a right-of-way secured from the owner of the coal property in 1905. Thereafter, the coal company acquired the land adjacent to the railroad, leasing it to the Middle Creek Coal Company which began mining operations in that year. In 1908, 1909 and 1910 the railroad constructed sidings in the mine and made extensions thereto as mining operations warranted. Middle Creek operated intermittently until 1930 when it abandoned the mine, and in 1934 and 1935 the sidings and extensions were torn up and removed by the railroad.

The increased need for coal occasioned by the war, led to the view that coal could still be profitably extracted from the mine,

and in 1942 the property was leased to one Cameron, who assigned to Paintsville-Millers Creek Collieries, Inc., which resumed mining operations. In the previous operation of the mine a tunnel, known as the left entry, was driven into the mountain side. This lies immediately west of the railroad's right-of-way, between 50 and 100 feet above it and roughly parallel with it. Conforming to accepted mining practice, pillars of coal were left in the entry to support the surface of the land, and a barrier was left along the base of the cliff between the end of the coal seams and the outcropping of the coal on the surface. The major mining operations were to the right of the left entry. With resumption of operations in 1942, and with purpose to fully recover all coal within the mine, the lessee proposed to remove the pillars and approximately 50 percent of the barrier. This is known as "pulling the pillars," a practice well recognized in the coal mining districts of Eastern Kentucky. On June 15, 1943, the railroad filed its complaint to enjoin this operation, on the ground that it would destroy the only support for the land surface above the left entry, causing slips and slides down the mountain side to the injury of its right-of-way and of the freight and passengers moving on its line. The coal company answered that the pillars were not necessary for the support of the surface land, denied that their removal would injure the railroad's property or interfere with its operations, asserted that the railroad was estopped because it had encouraged the development of the mine for 33 years, and counterclaimed for damages due to the removal of the siding necessitating the hauling of coal by wagon, and for recovery of damage to its land by removal of lateral support in the original construction of the railroad in 1905.

Upon the issue of danger to the railroad property and operations thereon in pulling the pillars in the left entry and reducing the barrier, expert opinion evidence appears fairly well balanced, four qualified mining engineers attesting the danger and a like number denying it. There is, however, undisputed evidence to the effect that at a point 600 feet south of the place here involved, there had been a subsidence of the mountain side on to the railway track —a fact noted in the court's opinion, 56 F.Supp. 849, though not made the subject of a finding. The cause of this subsidence is not disclosed, but it may be assumed that no pillars were pulled at the point of the slide.

Notwithstanding the coal company's insistence that its proposed operations would not disturb the surface of the land, the court found that "there is possibility or even probability that the mountain side would slip or subside." It also found, however, that "it is not clearly shown to such an extent as to leave the mind of the court in no doubt that such slipping or subsidence would result in damage to the plaintiff's right-of-way." It thereupon announced as conclusions of law that the issuance of the injunction would cause great injury to the coal company, confer no comparable benefit on the railroad, that its right to an injunction is doubtful and that the railroad has a complete and adequate remedy at law either through money damages in the event of injury, or by incurring a comparatively small cost in protecting itself. As to the possibility that the mountain might fall at the time a train is at a particular point and injure or kill human beings, the court reasoned, in its opinion, that this would require a coincidence of events that can hardly be raised to the status of probability. At the most, such a happening would be a remote possibility and property damage, if any, not of such magnitude that it could not speedily and adequately be corrected. In explanation of its conclusion that the railroad could, at moderate cost, protect itself, and for that reason has a complete and adequate remedy at law, the court reasoned that because the railroad possesses the power of eminent domain and has, under the Kentucky Statute (K.R.S. 416.010) the right to condemn land to protect its right-of-way, it may avoid injury by purchasing or condemning the coal company's mine.

■ We consider the challenge to the decree denying permanent injunction, fully cognizant of the mandate of Rule 52(a), Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c, that "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." We are not here confronted, however, with any conflict of evidence as to evidentiary facts, nor with the credibility of witnesses. The issue is whether, in the light of all of the circum-

stances, there is threat of injury in the proposed operations of the coal company to the property of the railroad, and to the lives of passengers and crews upon its trains. The conclusion that there is or is not such danger, and if there is, whether it is imminent or remote, is one that a reviewing court is itself competent to draw. It remains free to draw the ultimate inferences and conclusions which evidentiary findings reasonably induce. Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 119 F.2d 704; Globe-Union, Inc., v. Chicago Tel. Supply Co., 7 Cir., 103 F. 2d 722; Letcher County, et al. v. De Foe, 6 Cir., 151 F.2d 987. Nor was there here a determination based in any real sense upon relative credibility of opposing witnesses. The evidence relied upon was opinion evidence as to the likelihood of future happenings. It may be assumed that each group of experts deposed honestly as to what might or might not happen in the light of its experience and scientific knowledge. So the court thought, and so do we. Impending danger from the proposed operations or its absence was but an inference to be drawn from opinions, exhibits and attendant circumstances.

■■ The primary test of equitable jurisdiction to grant a permanent injunction is whether there does or does not exist an adequate legal remedy for the injury sought to be prevented. What, in a given case, is or is not adequate legal remedy, must be determined in the light of the circumstances in each particular case. It has been well said that the legal remedy must not only be plain, speedy and adequate, but as adequate to meet the ends of justice as that which the restraining power of equity is competent to grant. Society of Sisters of the Holy Names of Jesus & Mary et al. v. Pierce, D.C., 296 F. 928, affirmed 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468; Gormley v. Clark, 134 U.S. 338, 10 S.Ct. 554, 33 L.Ed. 909.

■ If the threatened injury to the railroad right-of-way be envisioned merely as the sliding of some of the surface material of the mountain upon the railroad right-of-way necessitating some expense in its removal and in the repair of the roadbed, we might well say that recovery of damages in a suit at law provides adequate remedy. We have here, however, a railroad over which pass trains bearing passengers and freight. Their daily number is not disclosed by the record, and being but a branch line it may be assumed that the traffic is not heavy. Nevertheless, traffic there is, and the effect of a substantial mountain slide upon a passing train might well be catastrophic. It may be that such disaster could occur only upon a concatenation of circumstances of not too great probability, and that the odds are against it. It is common experience, however, that catastrophies occur at unexpected times and in unforeseen places. The pictorial exhibits graphically depict the steep face of the cliff behind which the pillars stand, and its proximity to the railway tracks, and it is indeed bold prophecy which denies the threatened danger. A court of equity will not gamble with human life, at whatever odds, and for loss of life there is no remedy that in an equitable sense is adequate. It is true that courts of law have developed formulae for measuring, by resort to earning power and life expectancies, the damage suffered by survivors through death. Such yardsticks are, however, arbitrary and crude, applied only for want of better measure, and by no means comparable in adequacy to the restraint which equity affords. What has been said of possible loss of life through the operations of the coal company applies also to disruption of train schedules and the consequential inconvenience and loss to passengers and shippers using the railroad. For this there is likewise no adequate remedy at law. Joy v. City of St. Louis, 138 U.S. 1, 46, 49, 11 S.Ct. 243, 34 L.Ed. 843; Seaboard Airline R. Co. v. Olive, 142 N.C. 257, 55 S.E. 263; Atchison, Topeka & Santa Fe Ry. Co. v. Spaulding, 69 Kan. 431, 77 P. 106, 107, 66 L.R.A. 587, 105 Am.St.Rep. 175, 2 Ann.Cas. 546. As was said in the last cited case, where "the rights of the public are involved; the safety of public travel demands a clear track." Finally, there is evidence that if subsidence of the mountain occurs it will result in slides not at one time or place but in many places and over an extended period of time. This is persuasive in view of the fact that the left entry parallels the railroad for several thousand feet. If that be so, remedy at law will entail a multiplicity of suits, avoidance of which has of itself been considered sufficient basis for the exercise of equity power to restrain and enjoin.

■ It is urged that the railroad has a legal remedy in its possession of the power of eminent domain and its right, under Kentucky law, to condemn land if necessary to protect its right-of-way. The short answer to that contention is that if the railroad thus sought to protect itself, it would be obliged to prove necessity for the taking. The argument therefore defeats itself because if threat of injury is too remote to justify injunction, it is likewise too remote to establish necessity for condemnation. City of Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208, furnishes no support for a contention that possession of the right of eminent domain by one threatened with injury gives him an adequate remedy by recourse to that right. No such doctrine has been discovered in any reported case, and, if adopted, would open wide the door to fraud and coercion. It was the defendant in the Harrisonville case and not the plaintiff, which possessed the right to condemn —a right, the exercise of which would have permitted it to preserve the use of its property and save it from restraint and damages notwithstanding its own trespass. The New York cases typified by Pappenheim v. Metropolitan Elev. Ry. Co., 128 N.Y. 436, 28 N.E. 518, 13 L.R.A. 401, 26 Am.St.Rep. 486, go no further, and it would be violative of all just concepts to say that one may compel another to buy or condemn his land by threat of trespass on that of the other.

■ A secondary consideration by a court of equity in the grant of a permanent injunction, is to regard the comparative injury which would be sustained by the defendant if an injunction were granted and by the plaintiff if it were refused. Russell v. Farley, 105 U.S. 433, 438, 26 L.Ed. 1060. This has frequently been referred to as the "balance of convenience test." It is recognized by the courts of Kentucky. Herr v. Central Kentucky Lunatic Asylum, 110 Ky. 282, 289, 61 S.W. 283. It was undoubtedly applied by the court in the present case, but upon an erroneous evaluation, we think, of the comparable injury to the railroad and the coal company. The evidence disclosed that there were approximately 136,000 tons of coal remaining in the mine, of which 27,000 were in accessible left entry pillars, of which approximately 20,000 tons were recoverable. The court made no specific finding as to the coal recoverable from the pillars, except that it was somewhere between 10,000 to 30,000 tons. It must be noted, however, that the railroad seeks no restraint of mining operations to the right of the left entry, the pillars of which are estimated to contain upwards of 100,000 tons. The evidence also discloses that the expectable profit in the mining operation will be about 50¢ per ton, and that the lessor receives a royalty of 10¢ per ton. Accepting the maximum estimate of coal in the left entry and the complete success of the mining operation, the injury occasioned by the permanent injunction either to lessor or lessee will not be great.

■ Though no injury had yet been shown to have been incurred by the railroad, possible future injuries may be enjoined, Swift & Co. v. United States, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587; Vicksburg Waterworks Co. v. Vicksburg, 185 U.S. 65, 22 S.Ct. 585, 46 L.Ed. 808, and suits are not premature because the plaintiff does not await an actual test of the results of a proposed or threatened act. Com. of Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117, 32 A.L.R. 300; Society of Sisters of the Holy Names of Jesus & Mary et al. v. Pierce, supra. We find nothing in Brandenberg v. Petroleum Exploration et al., 218 Ky. 557, 291 S.W. 757, whch militates against the granting of an injunction in the present case. The appellant there could have prevented oil drilling upon the land, based on her homestead rights, even though the fee was in her children. Failing to do so she was clearly estopped. We find there no resemblance whatsoever to the present case. It is our conclusion that the court should have granted a permanent injunction restraining the pulling of the pillars or in reducing the coal barrier in the left entry of the mine.

The coal company's counterclaim was based upon damages alleged to have been suffered in 1905 when the railroad constructed its right-of way. The claim was that removal of soil beneath the cliff weakened lateral support for the mine, caused slips and slides, and prevented access to the mine through the side of the cliff. A second basis for the counterclaim was the removal of the railway sidings in 1934 and 1935. This necessitates the hauling of coal 6¼ miles for shipment, at a cost of 50c per ton. The coal companies moved for judgment on the plead-

ings and the record—a motion which was by consent treated as a motion for summary judgment, and the railroad likewise moved for summary judgment. The granting of such judgment is now claimed by the coal companies to be erroneous in that they were deprived of their right to trial by jury.

Rule 56(c) of the Federal Rules of Civil Procedure, provides that if there is no genuine issue as to any material fact that the moving parties are entitled to judgment as a matter of law. The purpose of the rule is to dispose of cases where there is no genuine issue as to material facts. Fletcher v. Krise, 73 App.D.C. 266, 120 F.2d 809; Miller v. Miller, 74 App.D.C. 216, 122 F.2d 209; Board of Public Instruction v. Meredith, 5 Cir., 119 F.2d 712. See commentary of Dean (now Judge) Clark, 15 A. B. A. Journal 82, 83. The federal courts have long recognized and enforced state summary judgment statutes. Atkinson v. Bank of Manhattan Trust Co., 7 Cir., 69 F.2d 735; Schreffler v. Bowles, 10 Cir., 153 F.2d 1, and such judgments may issue for laches or because of limitation. Gifford v. Travelers Protective Ass'n of America, 9 Cir., 153 F.2d 209. The issues here presented by the record and pleadings primarily involve questions of law. The court was empowered to enter a summary judgment.

The first claim of the coal company is clearly barred by limitation. Whatever injury was inflicted upon the coal lands was suffered by its owners in 1905, at which time the cause of action arose, and before the coal company acquired the mine. It seems too clear to require exposition, that this claim does not grow out of the subject matter of the railroad's bill of complaint, nor is it of a nature to support set-off or equitable recoupment. As to the coal company's second claim, it could have been and was disposed of by reference to the railroad's contract with the Middle Creek Coal Company. That contract provided that the railroad should have the right to take up and remove its sidings if shipments from the side tracks in any one year were less than 50 cars. The record discloses that mining operations were wholly abandoned in 1930 and the sidings removed in 1934 and 1935. The railroad was within its rights.

The judgment in No. 9987 is affirmed; that in No. 9988 reversed and the cause remanded with direction to the district court to enter a decree in conformity herewith.