**PENN CENTRAL COMPANY, Plaintiff,**

**v.**

**BUCKLEY & CO., Inc., a corporation of the Commonwealth of Pennsylvania, Schiavone Construction Company, a corporation of the State of New Jersey, and Schiavone-Buckley, operating as a joint venture with principal offices at 1600 Paterson Plank Road, Paterson, New Jersey, Defendants.**

**Civ. A. No. 871–68.**

United States District Court

D. New Jersey.

Nov. 27, 1968.

As Amended Dec. 4, 1968.

Lum, Biunno & Tompkins, by Joseph R. McMahon, Newark, N. J., Walter Fessler, Convent, N. J., Carl Helmetag, Jr., Philadelphia, Pa., for plaintiff.

Nolan & Lynes, by Jerome M. Lynes, Newark, N. J., for defendants.

## OPINION

WORTENDYKE, District Judge:

This cause came on for hearing upon return of an order to show cause why injunctive relief should not be accorded to plaintiff as prayed for in the complaint. In lieu of the findings of fact and conclusions of law required by F.R.Civ.P. 52 the Court's Opinion is as follows:

Plaintiff (Penn Central) is a corporation of the Commonwealth of Pennsylvania. It operates an extensive railroad system in interstate commerce for the transportation of passengers and freight. A substantial portion of these operations are in the State of New Jersey. The defendants are Buckley & Co., Inc., a corporation of the Commonwealth of Pennsylvania; Schiavone Construction Company, a corporation of the State of New Jersey and Schiavone-Buckley, operating as a joint venture. At all times relevant to the factual issues herein the Schiavone-Buckley joint venture was engaged in the performance of a certain construction contract for the widening of the New Jersey Turnpike with the Authority under Contracts No. W–1601 and W–1602.

In conducting interstate transportation between New York City in the State of New York and Newark in the State of New Jersey, and points else-

where in the United States, south and west of Newark, Penn Central has a two-track main railroad line extending between Newark and New York City which provides the only rail access of Penn Central to and from New York City. Over 68,000 people are transported over this main line daily between and including Monday and Friday of each week. Many of these passengers are commuters traveling to and from New York City in the pursuit of their daily gainful occupations.

Penn Central's main line segment between New York and Newark crosses the Hackensack River, a navigable water course in the State of New Jersey. To accomplish this crossing Penn Central and its predecessor companies have, since 1910, maintained a bridge known as Undergrade Bridge 6.10. This bridge clears by approximately 24 feet the mean high water level of the river and is of the swing type. When vessels of a height which will not permit their passing beneath the bridge require passage through the same, the bridge is opened by turning upon its center pillar to a position approximately at right angles to its closed position, or roughly parallel to the shore and in line with the flow of the river. With the bridge in its open position, two channels, each approximately 200 feet in width and known respectively as the east and west channels, are open to river traffic. The bridge is lighted at night and navigation lights are maintained to assist river traffic in the vicinity thereof. The opening and closing of the bridge is accomplished by a complex system of gears, shafts and levers activated electrically and pneumatically. This machinery, if severely damaged, would require considerable time for repairs thereto because of the necessity of fabricating or otherwise acquiring the special components required for its operation. In addition to the machinery which opens and closes the bridge there is additional machinery installed primarily at the ends of the swinging portion of the bridge which is required for the inter-locking of the railroad's signal system. This system is essential to the safe operation of the railroad because of the heavy rail traffic over the bridge. For the bridge to function, all of the complex machinery and signal installations above described must operate. If this machinery were seriously damaged it would not function during the making of the necessary repairs which would consume an extended period of time. While the bridge is not functioning, either rail or river traffic, or both, would come to a standstill with resulting inconvenience and harm either to the railroad and the members of the public using its service every day or to water traffic on the river or both.

River traffic on the Hackensack River is extensive. In August 1968 the bridge was opened 634 times to permit the passage of vessels of heights exceeding the span height of the closed bridge. The river traffic has been increasing by reason of the defendants' operations which have consisted of towing of loaded and empty fill barges through the channels spanned by the bridge, and these operations are expected to continue for at least another year.

The bridge is protected against strikings by passing vessels by means of an elaborate fender system. The principal part of this fender system is comprised of a wooden structure in the center of the river roughly parallel to the opposite shoreline at that location. When the bridge is in its open position, this midstream fender structure extends approximately 33 feet beyond the ends and 4 feet beyond the sides of the movable bridge span. The fender structure is comprised of a series of pilings, each approximately 12 inches in diameter, driven into the river bed. Attached horizontally to the pilings are four rows of 12″ x 12″ timbers. Attached to the horizontal timbers are vertical timbers, each approximately 5″ x 8″. These items are placed next to each other and they completely enclose the horizontal timbers and the pilings within them. In addition to this center fender structure, there are, at

each end thereof, clusters of pilings also driven into the bed of the river and lashed together with heavy cables. There are fenders of similar construction along the two shore-side abutments of the bridge. Although the bridge and fender system were originally constructed over 30 years ago both have been constantly maintained by repair and replacement. During the past two years in the course of this maintenance program 80% of the fender system has been repaired by new timbers and pilings. There was no evidence before the Court upon the hearing on the return of the order to show cause tending to disclose that either the mechanical functioning of the bridge or the construction and maintenance of the fender system are other than adequate.

The procedure pursued in opening the bridge is as follows: Upon approaching the bridge, the vessel desiring the passage through one of the channels thereof blows three blasts on its whistle. The bridgetender, one of the three persons who man the bridge shifts around the clock, relays the vessel's whistled request by telephone to the bridge block tower operator at the eastern end of the bridge. The block tower operator, over an open telephone line to the train dispatcher in New York City, requests permission to open the bridge. The dispatcher either gives permission to open the bridge or orders it to remain closed. This decision by the train dispatcher depends upon the rail traffic in the vicinity of the bridge. If a train, either east or west of the bridge, is within five minutes running time to the bridge, the bridge will be kept closed; otherwise instructions will be issued to the bridgetender to open the bridge. The time consumed in transmitting a request for permission to open the bridge and the relay of instructions respecting opening occupies less than one minute; but there are delays in opening the bridge because of the presence of rail traffic on or in the vicinity of the bridge. On the shore of the Hackensack River south of the bridge is an area known as Snake Hill. Because of a bend in the river and the

presence of very strong tidal currents, this is one of the most treacherous navigation areas in the entire harbor of New York.

The defendants, in the performance of their contracts with New Jersey Turnpike Authority, move sand and other fill materials loaded in the vicinity of Staten Island, New York, in large scows having beams in excess of 35 feet, upstream in the Hackensack River to points north of the bridge. These scows are pushed or towed by five tugs viz: the Callahan, Elizabeth, San Pedro, San Carlos and Bull Frog. After the scows have been unloaded at the site of the turnpike widening operations they are moved, empty or light, downstream on the river and through the bridge to complete their return to the loading point near Staten Island. Within a 24 hour period several round trips of the scows are possible; the exact number depends upon loading and unloading conditions, the time required to pass through the several drawbridges on the river, etc. Under optimum conditions a round trip can be made in eight hours. The tugs of the defendants which move the scows are generally operating on a three-shift basis around the clock, except when laid up for repairs. In some instances defendants move two scows with one tug and in other instances one scow.

The tugs Callahan and Elizabeth are conventional-type boats having pointed bows and rounded sterns. They are both single screws and of the type generally used throughout New York Harbor. The tugs San Pedro, San Carlos and Bull Frog are "pusher" types, with square bows and are always used to push barges or scows. With the exception of the Bull Frog, which is twin-screw, the other tugs are single screw. The pusher tugs, to aid in reverse movements, are provided with so-called flanking rudders, one pair of which is forward and the other pair aft of the screws. They provide improved control of movements astern. These pusher tugs were purchased or acquired about the time the defendants began their op-

erations on the Hackensack River. Previously they had been in use on inland rivers in Texas and in the Chicago area, but had not been previously used in the New York Harbor area. The pusher tugs are primarily designed for use in rivers, such as the Mississippi where they generally push in a straight direction, but they are not designed for areas requiring great maneuverability.

On August 8, 1968 at 2:00 A.M. the tugboat San Pedro, while towing two scows north on the Hackensack River, struck the west fender system of the drawbridge on the northside of the west channel. On the same date, at 11:20 A. M., the tugboat San Carlos, pulling two scows south on the river, struck the southside of the center fender of the bridge in the west channel. At 1:30 A. M. on August 24, 1968 the tugboat Bull Frog, while towing two scows northerly on the river struck the southside of the west fender in the west channel of the draw. At 2:48 A.M. on August 25, 1968 the tugboat Bull Frog, while hauling two scows in a northerly direction through the draw, struck the southside of the west fender in the west channel. On August 26, 1968 at 5:00 A.M. the Bull Frog, while hauling two barges south struck the southside of the west fender in the west channel of the draw. The foregoing contacts with portions of the fender system inflicted substantial damage thereon. The impact of the August 8 striking drove the center fender over 4 feet into the east channel of the draw which necessitated the closing of that channel for repairs. Each of these strikings involved a tow consisting of two scows moved by a single pusher-type tug. No strikings of the fender system occurred when single scows were being moved either by pusher or conventional-type tugs.

On August 9, 1968 Robert Buckley, Vice President of the defendant Buckley & Co., Inc., advised the railroad's Assistant Superintendent-Freight that the tows of fill barges would be reduced from two scows to one and expressed the expectation that such an arrangement would permit defendant's personnel to improve the handling of their tugs and scows. However, the strikings of August 24, 25 and 26 involved a single tug with two attached scows.

A qualified tugboat captain, with 35 years experience in tugboat operation in the New York Harbor area, expressed the opinion, which was uncontroverted, that the operation of two large scows by means of a single tug is dangerous in the Hackensack River in the vicinity of plaintiff's drawbridge and constitutes a practice incompatible with good seamanship. The same witness expressed the further opinion that safe operation of scows through the draw of the plaintiff's bridge required no more than a single scow with a single tug. It was also the opinion of the same witness that pusher-type tugs were not suitable for the handling of scows in areas where great maneuverability is required, as in the approaches to and negotiation of the passage of plaintiff's drawbridge.

The evidence disclosed that upon several occasions the plaintiff failed to comply with the United States Coast Guard's Regulations by completing the opening of its drawbridge within the time prescribed of 10 minutes after receiving a tugboat's whistle request. These bridge opening delays occurred principally during the morning and evening commutation hours when plaintiff's rail traffic is very heavy into and out of New York City. However, none of these bridge opening delays was a cause of any of the strikings of plaintiff's fender system which occurred during the month of August 1968. No complaint was made by or in behalf of defendants of any of the bridge opening delays which concededly occurred.

Between August 1 and September 22, 1968 the usual method of towing on the Hackensack River in the area involved in this case is by movement of a single scow by a single tug. During the same period 74, or less than 26.1%, of the tows which have passed through plaintiff's draw have consisted of more than a single scow moved by a single tug. Of

the seven strikings of the bridge fender system during the same period only one has involved a tow consisting of a single scow while six, or 85.9%, have involved tows of two or more scows. Thus, while the operation of two or more scows with a single tug was involved in only 26.1% of the tows passing through the draw they have occasioned 71.4% of the total strikings during the period stated.

There was no evidence presented on the trial of this case, other than that hereinabove reviewed, which disclosed the details or extent of the damage resulting from the strikings of the fender system of which the plaintiff complains, nor was there any disclosure respecting the nature and extent of plaintiff's claims for damages resulting from those strikings or that, if such claims were made, they have not been or are not in the process of being satisfied.

■ Jurisdiction in this case is predicated upon the plaintiff's contention that its claim is maritime in character and therefore within the admiralty jurisdiction of this Court. The relief prayed for by the plaintiff is twofold, i. e., a judgment for damages and for an injunction "to restrain the mode and method of operation presently used by the * * * defendants in the operation of its tugs and scows to prevent any further negligent interference with the conduct of the business of the plaintiff."

When the verified complaint in this action was filed the plaintiff sought and obtained an order to show cause why a preliminary injunction should not be issued "restraining the * * * defendants in the present mode of operation of their tugs and scows * * *". Upon the return of the order to show cause evidence was adduced in behalf of all parties and the hearing upon the return was treated as a final hearing in the cause.

■ I conclude that the plaintiff is not entitled to the injunctive relief prayed for in the complaint.

■ Assuming that the admiralty jurisdiction of this Court includes the power to grant equitable relief by way of injunction, such relief is nevertheless an extraordinary remedy and will not be granted unless the evidence satisfies the Court that the criteria for the granting of injunctive relief have been clearly disclosed by the proofs. It is elementary that injunctive relief will not be granted where the plaintiff has an adequate remedy at law, and the absence of such a remedy must be clearly disclosed by the evidence. No such situation is presented in this case. Indeed the complaint itself, in seeking damages for the succession of alleged torts created by the strikings, suggests the existence of an adequate remedy at law. Such a remedy, dependent of course upon the presentation of appropriate evidence, would be available in the form of money damages to compensate the plaintiff for all losses, including the cost of repairs, which may be shown to have resulted from the strikings of the fender system, assuming of course, that those strikings resulted from negligence on the part of the defendants.

■ Another principle which must be kept in mind upon an application for an injunction is to be found in the general rule that a Court of Equity will not grant injunctive relief unless it is shown that, if an injunction is granted the Court may enforce the mandate of the injunction. In effect the plaintiff here is asking this Court to direct the manner in which the defendants shall conduct their operations in availing themselves of their right to use the Hackensack River, a navigable water course of the United States, Clement v. Metropolitan West Side El. Ry. Co., 123 F. 271 (7 Cir. 1903) for the purpose of navigation in transporting in interstate commerce the cargoes of construction fill required for defendants' performance of its contract for the widening of the New Jersey Turnpike. The defendants have a right, subject to the regulations of the United States Coast Guard, to navigate the inland waterway of the United States in the pursuit of interstate commerce and to use vessels appropriate to

such operation to have such waterways unobstructed for navigation purposes; subject only to such rights to erect, maintain and operate a bridge as may have been granted to the plaintiff and its predecessors by the War Department or other appropriate agency of the United States. In exercising their right of navigation the defendants, of course, are required to exercise reasonable care, to avoid damaging the lawful installations of the plaintiff. The evidence fails to show that, although the majority of the strikings that occurred during the limited period stated involved two-scow tows, the occurrence of strikings inflicted by one-scow tows or by vessels operated by others than the defendants is not negated. The prayer for injunctive relief in this case is tantamount to a request by the plaintiff that this Court participate in the regulation of the manner in which the defendants may exercise their navigation rights in the Hackensack River through the plaintiff's draw. In effect the Court is being asked to monitor the defendants' operations, and, in forbidding defendants' use of two-scow tows, to determine, as a matter of law, in the light of the evidence presented, that only one-scow tows can negotiate the bridge channels without inflicting damage upon the plaintiff's structure. The evidence is inadequate to impel the Court to such a conclusion. While it discloses a succession of strikings of the fender system by vessels of the defendants, and while the majority of those strikings were inflicted by two-scow tows, it is insufficient to support the conclusion that two-scow tows cannot be employed by the defendants in negotiating the bridge draw without infliction of any damage upon the bridge structure or its appurtenances.

Plaintiff's reliance upon Harris Stanley Coal & Land Co. v. Chesapeake & O. Ry. Co., 154 F.2d 450 (6 Cir. 1946) cert. den. 329 U.S. 761, 67 S.Ct. 111, 91 L.Ed. 656 (1946) for support of its claim for injunctive relief is misplaced. The facts in that case are in no respects similar to those disclosed by the evidence in the present action. In *Harris Stanley* a railroad sought to restrain certain mining operations by a coal company adjacent to the railroad's right-of-way. The ground urged for injunctive relief against the coal company was predicated upon the contention that its operation threatened injury to the operation of the railroad and constituted a hazard to the freight and passenger traffic moving over its line. In the previous operation of the mine a tunnel was driven into the mountainside which lay immediately west of the railroad's right-of-way and between 50 and 100 feet above it. Pillars of coal were left in the entry to the mine to support the surface of the land and a barrier was left along the base of the cliff between the ends of the coal seams and the outcropping of the coal on the surface. A lessee of the mine owner contemplated a resumption of previous operations which had been suspended for several years. In order to recover all the coal within the mine, the lessee proposed to remove the pillars which had been left after the previous operation and also 50% of the barrier. This contemplated procedure was locally known as "pulling the pillars", a practice well recognized in the vicinity. The railroad sought to enjoin this operation upon the ground that "it would destroy the only support for the land surface above the left entry, causing slips and slides down the mountainside to the injury of its right-of-way and of the freight and passengers moving on its line." Pointing out that the primary test of equitable jurisdiction to grant a permanent injunction is whether there exists an adequate legal remedy for injuries sought to be prevented, the Court nevertheless found, upon the evidence presented, that the activity contemplated by the mining lessee would endanger human life and therefore should be enjoined upon the ground that a Court of Equity will not gamble with human life at whatever odds and also on the ground that for loss of life there is no remedy that is, in an equitable sense, adequate. The Court moreover found that the "balance of

convenience" test when applied to the evidence favored its injunctive interposition between the parties.

While it is true that the evidence in the case at bar discloses that the plaintiff's bridge was used to carry much commuter traffic during certain hours between New York and points west, and that damage to the drawbridge, which held up the passage of plaintiff's trains during commuting hours might inconvenience some or all of its passengers, the risk of irreparable damage which was present in the *Harris Stanley* case is completely absent in the case at bar, and the evidence therein failed to disclose that the life or property of any particular commuter on the railroad would be endangered if a striking of the bridge structure by a two-scow tow were to occur.

The defendants may present an Order denying the injunctive relief prayed for in the complaint.