Randolph VAZQUEZ, et al., Plaintiffs,

v.

Timothy CARVER, et al., Defendants.

Civ. A. No. 86–3020.

United States District Court,
E.D. Pennsylvania.

Oct. 5, 1989.

André L. Dennis, Philadelphia, Pa., for plaintiffs.

Henry S. Perkins, County of Lehigh, Allentown, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

### INTRODUCTION

This class action was brought under 42 U.S.C. § 1983 on behalf of present and future inmates of Lehigh County Prison (LCP). Plaintiffs have challenged various conditions of their confinement at LCP.[1]

After hearing extensive testimony regarding the conditions and personally touring the prison, I denied plaintiffs' initial motion for a preliminary injunction on July 27, 1987. In my Memorandum and Order denying this injunction, I expressed serious concerns regarding the then existing conditions at LCP and sent a strong signal to the defendants that upon the making of a more complete record "the totality of the conditions at LCP will be held to be unconstitutional." In addition, my decision denying injunctive relief was based to a large extent upon my findings that the new pris-

on administration had discontinued past practices which would have seriously worsened the conditions at LCP and that the record did not support a conclusion that these practices would be reinstated.[2] As will be explained below, the record before me demonstrates that the prison officials have resumed such practices because of the substantial increase of the prison population since 1987.

Subsequent to my decision in 1987, the parties recently executed and delivered a Consent Decree, for which Court approval is presently pending, which provides that the inmate population at LCP shall be reduced to 242 inmates by November 9, 1989.[3] Defendants candidly admit that this deadline will not be reached. However, defendants may be able to transfer approximately 240 inmates to a new facility as early as January 1990.

Plaintiffs have renewed their motion for a preliminary injunction in light of recent developments which have substantially increased the prison population at LCP. Plaintiffs assert that "[d]uring the past 2½ years since the Court issued its Memorandum and Order, the conditions at LCP have considerably worsened to the point where the present conditions of confinement are in violation of Eighth and Fourteenth Amendments of the United States Constitution." Plaintiffs seek the imposition of a cap that would reduce the prison population from approximately 420 inmates to 310 inmates.[4]

---

1. By order of May 1, 1987, I permitted this action to proceed as a class action. The plaintiff class consists of all present and future inmates of LCP, and includes a subclasses of all present and future female, Black and Hispanic inmates. The present motion does not include the female inmates being housed at the Women's Annex. The defendants are the Warden and Deputy Warden of LCP as well as the members of the Board of Commissioners of the Lehigh County. Lehigh County and Prison Health Services, Inc. are also named defendants. Defendants Henry Barr, Jay C. Waldman and Glen Jeffes have been dismissed from this action.

2. I specifically refer to the housing of inmates in the GED classroom, requiring a third inmate to sleep on a mattress on the floor in certain areas of the prison, confining more than two inmates in the holding cells in the Old Jail

section of the prison and not increasing the amount of "block out" time.

3. The original decree only reduced the population to 278 inmates; however, this number was further reduced subsequently. The proposed Consent Decree requires that Lehigh County shall construct a new prison by late 1991. The Consent Decree also provides for the settlement of numerous other issues, including medical screening of inmates, inmate classification, lighting, ventilation, heating, exercise periods, law library access, medical care and sanitation.

4. The motion presently before me does not concern the population of female inmates presently being housed at the Women's Annex nor does it involve the other issues raised by plaintiffs' complaint. Specifically, the amended class action complaint also includes allegations of un-

This memorandum represents my findings of fact and conclusions of law relating to the renewed motion for a preliminary injunction. Because the plaintiffs have demonstrated that prison over-crowding has significantly increased [5] and that conditions of confinement now transgress the "minimal civilized measure of life's necessities," *see Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), I shall grant the preliminary injunction. Defendants shall have a period of forty-five (45) days from the date of this order to reduce the present prison population to 310 inmates.

## FINDINGS OF FACT [6]

Lehigh County Prison is located in the center of downtown Allentown, Pennsylvania. The prison's population includes a large percentage of pretrial detainees as well as a number of convicted prisoners awaiting sentencing or serving sentences of five years or less. The prison population consists of approximately 60% pretrial detainees and 40% sentenced offenders.

As with other penological institutions throughout the country, LCP has experienced sudden and drastic increases in its inmate population in recent years. In 1972, the prison population averaged 90 inmates; however, within three years the population more than doubled to 200 prisoners. By 1986, the population rose to the level of over 300 inmates. Presently, LCP has approximately 420 prisoners.

## OLD JAIL

The original structure, known as the Old Jail, of LCP was built in 1867. Since that time, the physical facilities have been expanded to include several distinct living areas. I will briefly discuss each of these areas separately.

The Old Jail, used to house general population prisoners, consists of two floors containing 17 cells each. I previously found that approximately 104 square feet of floor space exits for each cell, and that the lighting and ventilation was poor in this area of the prison. Each cell in the Old Jail contained two double-tier bunk beds, four foot-lockers, and a toilet and sink unit. In most of the Old Jail cells, four prisoners occupied each cell which allowed an average of 26 square feet of space per prisoner. In this section, prisoners received nearly seven hours of "block out" time per day that could be spent in 1465 square feet of "day area" space on the ground floor.[7]

## NB1 AND NB2

NB1 and NB2 are two cell areas which comprise that part of LCP known as the "New Building." NB1 houses the inmates employed in various jobs throughout the prison, while NB2 was utilized to temporarily quarter those inmates awaiting classification and permanent cell assignments. Both NB1 and NB2 contain 12 cells, each measuring approximately 70 square feet

safe and inadequate medical services; denial of access to the courts; denial of equal protection to Black and Hispanic inmates in the assignment of prison jobs, cell assignments and the administration of discipline; denial of equal protection through a lack of comparable facilities, rights and programs for female inmates; a lack of privacy for female inmates; and a denial of the right to petition under the First Amendment.

5. At the time of my earlier denial of plaintiffs' motion for a preliminary injunction, the prison inmate population was approximately 260. Since that time, the population has increased by approximately 160 inmates and conditions have considerably worsened.

6. For the purposes of this motion, I shall incorporate by reference the Findings of Fact of my

July 27, 1987 Memorandum and Order as well as the record established during the extensive hearings held on the initial motion.

7. "Block out" time refers to the period of time during which prisoners are not confined to their cells. "Day area" is that space within each section of LCP in which the prisoners may go when not confined to their cells. Plaintiffs have not provided the Court with any evidence which demonstrates that the conditions with respect to housing in the Old Jail area of LCP have changed since my decision in 1987. However, as will be explained below, prisoners from other portions of LCP now utilize the Old Jail's day area space which reduces the amount of such space available to each prisoner. Therefore, the average available day area is significantly less than the 10.8 square feet of space per inmate that was provided in 1987.

each. Each cell is equipped with one double-tier bunk bed, two wardrobe footlockers, a desk, a chair and a toilet and sink unit. At the time of the first preliminary injunction hearing, only two inmates occupied each of the NB1 and NB2 cells.[8]

The evidence produced at the current hearing demonstrates that 11 of the 12 cells are presently being occupied by three inmates. The third inmate is required to sleep on a mattress located on the floor near the toilet and sink unit. Accordingly, inmates in these cells are now provided with only approximately 23 square feet of space as opposed to the 35 feet of space available in 1987.

In addition, 10 inmates have been assigned to cots in the day area of this section and eight other inmates have been quartered in office space equipped with cots in NB2. The twelfth cell in NB2 remains vacant so that those inmates presently housed in the office area and day area of NB2, a total of 18 inmates, may utilize the bathroom facilities of this cell. Prisoners in NB2 are also restricted to their cells for the majority of the day and the four hours of "block out" time available to them is restricted to the hallway of the NB2 section of LCP.

I find that NB1 is presently used to house both prisoners who have already been classified and those awaiting classification contrary to prison policy.

While crowding has not substantially affected the NB1 section of LCP, Warden Meisel testified that three inmates are presently being housed in the store room area of this section.

## NEW JAIL

The New Jail, constructed in the early 1900s, contains six tiers (1 North, 1 South, 2 North, 2 South, 3 North and 3 South).[9] Each tier consists of 14 cells with approximately 40 square feet. In 1987, I found that only two prisoners occupied each of the cells in 1 North, 1 South and 2 South. Each cell contained a double tier bunk bed, two footlockers, a sink and toilet unit and a nook for personal belongings. I found the lighting and ventilation to be poor but adequate.

However, plaintiffs have provided evidence which demonstrates that two prisoners occupy 13 of the cells in 1 South with eight others quartered in the "gallery area" of this tier.[10] Consequently, the day area space available to the inmates on 1 South has been significantly reduced. The inmates presently lodged in the 1 South gallery area have no direct access to the bathroom and running water. The fourteenth cell in 1 South remains vacant for the use by these inmates as a toilet facility. In order to utilize the bathroom, the eight inmates in the gallery area of 1 South must request and receive the assistance of a corrections guard to open the gate to the gallery area and give access to the cell block area where the bathroom is located.

A similar occupancy problem exists in the 2 South, 2 North and 3 South tiers of the New Jail. Presently, 11 inmates occupy the gallery area of 2 South, 16 prisoners are housed in the gallery section of 2 North and 21 inmates are quartered in the gallery section of 3 South.[11] These inmates are

8. I note that at that time plaintiffs argued that the prison often placed a third inmate in these cells by requiring him to sleep on a mattress on the floor. I found, however, that the practice of adding a third inmate to these cells was discontinued and that no "imminent threat that this policy would be reinstated" existed.

9. 1 North, 1 South and 2 South house the general population of the prison. The remaining three tiers quarter those inmates in the Behavioral Adjustment, Administrative Custody and Mental Health sections of the prison.

10. The "gallery area" is that area between the cells on the tiers of the New Jail and the officer

chase area. The County defendants cut the bars between these areas to create the gallery area, giving the inmates access to more day room space. In my earlier decision, I considered the gallery area space to be part of the day area space available to inmates during block out time.

11. I note that the prison has not instituted this practice on the 1 North tier of LCP. However, I find that if the prison population were permitted to continue to increase, then the prison could be forced to house prisoners on this gallery area as well. Because 1 North confines the "tougher" prisoners at LCP, this may present a

also denied direct access to lavatory and running water, and must utilize, upon gaining access to the tier's cell block from a corrections guard, the facilities in the one vacant cell on that tier.

In addition, the living arrangements in the gallery areas of 2 South, 2 North and 3 South have caused the interaction between inmates of different classifications. For example, the inmates housed in the gallery area of 3 South are general population prisoners who come into contact with the Mental Health inmates confined in the cell block of 3 South. Similar problems have arisen with Administrative Custody inmates of the other tiers of the New Jail, despite the fact that these inmates are supposed to be segregated from the remainder of the prison population.

## HOLDING CELLS

Two holding cells measuring 6' by 10' are located in the Old Jail area. At the time of the preliminary injunction hearing, only one inmate occupied each cell at a time, but I noted that both cells were equipped for the possibility of double bunking in the future. Each cell contains a toilet and a sink. Originally, these cells were designed for only temporary housing of prisoners pending classification and assignment to permanent cells. However, these cells have been used for long-term housing of inmates in special need of isolation from the general prison population.

Presently, these cells are used to house as many as five inmates at one time. I find that such occupation is only for the temporary incarceration of inmates entering and leaving LCP. However, this confinement limits the total living space of each prisoner to only 12 square feet per prisoner. Moreover, inmates in this section of LCP have much more limited opportunities for block out time.

## THE GED AND WEIGHT ROOMS

From May 1986 to October 1986, the GED classroom was used to house up to 20 inmates on cots in a dormitory fashion. These inmates shared one toilet and sink, and had to be escorted to a separate area to shower. At the time of the initial preliminary injunction hearing, I found that this practice had terminated and "that the current administration would [not] again use this room to house inmates."

Because of the recent influx of prisoners to LCP, the prison has reinstituted its practice of using the GED classroom for this purpose. Eighteen general population inmates are housed on cots in the GED room. One inmate has complained of an assault by another prisoner upon him with the leg broken off from one of these cots. Warden Meisel candidly admitted on direct examination that he has received reports of parts of cots being used in this fashion, and that this presents a ongoing concern of his in maintaining prison security.

In addition, another twelve general population inmates are housed in the nearby weight room of the prison.[12] The inmates in the weight room share bathroom facilities with the inmates in the GED room, and a guard must allow them access to this area for this purpose. One prison guard oversees the inmates in the weight room and GED room. These inmates do not have any separate day room area, and they must go to the Old Jail day room area or outside LCP during "block out" time. This, of course, lessens the total "day room" area available to each prisoner in the Old Jail section of LCP.

## OTHER CONSIDERATIONS

Some prisoners have complained that they have been attacked by other inmates. I find that the crowded conditions at LCP have increased the potential for inmate violence, and that several recent assaults may be directly attributable to the present con-

---

danger to the safety of those prisoners placed in this gallery area. The inmates in 1 North have expressed their adamant opposition to the placement of inmates within this area and vowed to block any such placement.

12. The practice of housing prisoners in the GED room has been followed for at least the past four months, while prisoners have been lodged in the weight room since February 1989.

ditions at LCP. Moreover, the practice of housing inmates in the gallery areas of the New Jail section of LCP creates a present and imminent danger of future inmate violence. This is, in part, caused by the intermingling of inmates assigned to segregated units with inmates from the general population. I find that any additional increase in the inmate population at LCP, a prospect which seems very likely, would further jeopardize inmate safety.

LCP is currently unable to satisfy the minimum requirements established by Pennsylvania law for prisons in the areas of inmate classification, housing, bedding, law libraries, discipline, punishment and medical treatment. In addition, the availability of treatment programs at LCP has been reduced as a result of the present over-crowding.

## THE CONSTITUTIONAL STANDARDS

The Eighth Amendment prohibits prison conditions which inflict cruel and unusual punishment. The meaning of cruel and unusual punishment is drawn "from the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2398–2399 (citation omitted). "Today the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' or are grossly disproportionate to the severity of the crime. Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Id.* (citations and footnote omitted). Conditions of confinement which, alone or in combination, deprive inmates of the "minimal civilized measure of life's necessities" as measured by this contemporary standard must be held unconstitutional. *Id.* at 347, 101 S.Ct. at 2399. However, the Eighth Amendment does not mandate that prisons housing "persons convicted of serious crimes be free from discomfort." *Id.* at 349, 101 S.Ct. at 2400.

■ The conditions of confinement for pretrial detainees must be evaluated under a slightly different standard. The Court must determine whether these inmates have been deprived of their liberty without due process of law in violation of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 and n. 16, 99 S.Ct. 1861, 1871–1872 and n. 16, 60 L.Ed.2d 447 (1979). Incarceration of pretrial detainees does not constitute a violation of the Fourteenth Amendment unless the conditions of confinement amount to punishment of the detainee. *Id.* at 535, 99 S.Ct. at 1871–1872; *see also United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

In exercising its authority to detain a person pending trial, the Government "is entitled to employ devices that are calculated to effectuate this detention." *Bell*, 441 U.S. at 537, 99 S.Ct. at 1873. "Loss of freedom of choice and privacy are inherent incidents of confinement.... [T]he fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" *Id.* In determining whether a condition of confinement amounts to punishment in the constitutional sense of the word, the court must determine

whether the disability is imposed for the purpose of punishment or whether it is but an incident of some legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not consti-

tutionally be inflicted upon detainees *qua* detainees.

*Id.* at 538–39, 99 S.Ct. at 1873–74, quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963) (citations and footnotes omitted).

■ "Overcrowding is often the root cause of many complaints made by prisoners." *Hoptowit v. Ray,* 682 F.2d 1237, 1256 (9th Cir.1982). Crowding alone is insufficient to create a constitutional violation. It may only be viewed as cruel and unusual punishment "if it led to 'deprivations of essential food, medical care, or sanitation' or if it 'increased violence among inmates or create[d] other conditions intolerable for prison confinement.'" *Gilland v. Owens,* 718 F.Supp. 665, 668 (W.D.Tenn.1989), quoting *Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400.

Whether prison conditions are challenged under the Eighth or Fourteenth Amendment, the Supreme Court has repeatedly cautioned that federal courts must not interfere with the policy choices of state officials concerning the operation of prisons. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Bell,* 441 U.S. at 554, 99 S.Ct. at 1882. In deciding to grant plaintiffs' motion for a preliminary injunction, I am mindful that the question before me is whether the confinement of prisoners at LCP is within constitutionally permissible limits, and my obligation to protect the constitutional rights of those persons confined in LCP. *Rhodes,* 452 U.S. at 352, 101 S.Ct. at 2402; *Bell,* 441 U.S. at 562, 99 S.Ct. at 1886. My focus has not been on whether the conditions of incarceration at LCP offend my personal sensibilities, but on whether the record, as it exists at this time, establishes that the conditions at LCP have worked actual privations and hardships. I conclude that they have.

## CONCLUSIONS OF LAW

In ruling on this motion for preliminary relief, I must consider the moving party's likelihood of success on the merits; the probability of irreparable injury to the moving party in the absence of relief; the potential harm to the non-moving party; and the public interest. *S.I. Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985); *United States v. Price,* 688 F.2d 204, 211 (3d Cir.1982).

An injunction is an extraordinary remedy and this court's power to issue injunctive relief should be exercised sparingly. *Best Resume Service, Inc. v. Care,* 602 F.Supp. 653, 656 (W.D.Pa.1985); *Crawford v. Davis,* 249 F.Supp. 943, 945 (E.D.Pa.1966), *cert. denied,* 383 U.S. 921, 86 S.Ct. 923, 15 L.Ed.2d 676 (1966). Relief should only be granted when the equities are clearly in the moving parties favor. *Sovereign Order of St. John of Jerusalem–Knights of Malta v. Messineo,* 572 F.Supp. 983, 988 (E.D.Pa. 1983).

■ On the basis of the record before me, I conclude that the conditions at LCP would subject the pretrial detainees as well as the sentenced inmates to punishment in violation of the Eighth and Fourteenth Amendments, if the population of LCP were allowed to remain at its present level. Without a population cap, the inmates at the prison would be subjected to continued genuine "privations and hardship," and that these privations are not merely limited to the crowded conditions at LCP. Consequently, I find that plaintiffs have established a substantial likelihood of succeeding on the merits. I intimated as much in my earlier decision when the inmate population was approximately 160 inmates less.

The present prison population is approximately 110 inmates over the maximum number of permanent beds at LCP. In NB2, inmates are now triple bunked in 11 cells. This requires that 11 inmates sleep on mattress on the floor near a toilet and sink unit. Moreover, these inmates are confined to their cells for 20 hours of the day. Also, for the remaining four hours of the day, the same inmates are restricted to the NB2 hallway area during their block out time.

The present population at LCP has required that the administration at LCP improvise the living arrangements for over 100 inmates. Consequently, inmates are

being housed in areas not originally intended to act as cells or living areas. In most instances, these inmates have only limited access to bathroom facilities and must rely upon the availability of prison guards for access to those facilities set aside for their use in other portions of the prison. In one instance, 30 inmates must share a single toilet and sink unit.

Not only does the housing of inmates in this fashion create sanitation and habitation problems, but also it severely limits the average amount of space available for the total prison population during block out time. For example, the 30 inmates housed in the GED classroom and weight room must share day area space with those inmates quartered in the Old Jail section of LCP. Also, the bedding set up in the gallery areas in 1 South, 2 North and 2 South substantially reduces the amount of space available to inmates housed in those sections of the prison.

The combination of limited block out time,[13] reduced living space in many areas of the prison, limited access to bathroom facilities for many inmates and decreased availability of day area space leads me to conclude that LCP does not provide adequate shelter for a large portion of its population.

■ In addition, the record before me strongly suggests that a present and possibly imminent danger of inmate violence exists at LCP. Much, if not all, of this danger is directly attributable to the overcrowded conditions at LCP. A pretrial detainee, still cloaked with the presumption of innocence, should not be subjected to such a danger. The risk of future inmate violence is exacerbated by the intermingling of general population inmates with those inmates supposed to segregated from the remainder of the prison population.

I find that the potential for harm in the future resulting from prospective inmate violence caused by overcrowding constitutes irreparable harm to the plaintiff class.

I have considered the public interest. Nonetheless, I cannot ignore my responsibility to safeguard the constitutional rights of the inmates at LCP. After all, the public has an interest in protecting the civil rights of all persons as guaranteed under the United States Constitution. *Harris v. Pernsley,* 654 F.Supp. 1057, 1065 (E.D.Pa. 1987).

Accordingly, considering all of the competing interests present in this case, I shall grant plaintiffs motion. I note that I have wide latitude in fashioning a remedial order. However, this authority is not without its bounds. *See Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). I may not use my jurisdiction and remedial authority to order more extensive remedies than required. *Union County Jail Inmates v. Di Buono,* 713 F.2d 984, 1001 (3d Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984). In the first instance, I shall allow the defendants the primary responsibility for curing the constitutional violations which exist at LCP.

A reduction of the prison population to the total number of permanent beds should cure the constitutional violations which presently exist at LCP. Therefore, I shall order that defendants reduce the population of LCP to 310 inmates and maintain a population cap of 310 inmates on a permanent basis.

Finally, in order assure that the public interest is adequately protected, I shall allow defendants a period of forty-five (45) days in which to comply with my order.

An appropriate order follows.

### ORDER

Upon consideration of the plaintiffs' motion for a preliminary injunction, the response of defendants, the pretrial submissions of the parties, the evidence adduced at the hearings on this matter, the evidence adduced at the hearings on plaintiffs' initial

---

**13.** In some areas of the prison the time is limited to four hours a day, while in others up to

seven hours of block out time may be available.

motion for a preliminary injunction, and the arguments of counsel, and for the reasons stated in the attached memorandum, plaintiffs' motion for a preliminary injunction is GRANTED.

It is hereby ORDERED and DECREED as follows:

1. The occupancy at Lehigh County Prison shall be limited to the 310 permanent beds presently available in the cell areas at the prison. Defendants shall reduce the inmate population at Lehigh County Prison to a level of 310 total inmates within forty-five (45) days of the date of this order.

2. This preliminary injunction shall remain in full force and effect until the final hearing on the merits or approval by this Court of the Consent Decree executed by the parties, whichever comes first.

3. No bond shall be required to be posted by plaintiffs as security for this preliminary injunction.

IT IS SO ORDERED.