**GLENSIDE WEST CORPORATION, Plaintiff,**

v.

**EXXON COMPANY, U.S.A., A DIVISION OF EXXON CORPORATION, Defendant.**

**EXXON COMPANY, U.S.A., A DIVISION OF EXXON CORPORATION, Counterclaimant,**

v.

**GLENSIDE WEST CORPORATION, Counterdefendant.**

**Civ. A. No. 90–1333 (AJL).**

United States District Court, D. New Jersey.

April 8, 1991.

William M. Boyle, Rinaldo and Rinaldo, Elizabeth, N.J., for plaintiff/counterdefendant.

James Crawford Orr, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, N.J., Stuart H. Harris, Howrey & Simon, Washington, D.C., William R. Hurt, Exxon Co., U.S.A., Houston, Tex., for defendant/counterclaimant.

## OPINION

LECHNER, District Judge.

This is an action brought by plaintiff Glenside West Corporation ("Glenside") against Exxon Company, U.S.A., a Division of Exxon Corporation ("Exxon"), and counterclaims brought by Exxon against Glenside arising out of the decision by Exxon to terminate the retail motor fuel service station franchise of Glenside (Glenside and Exxon are collectively referred to as the "Parties"). Glenside alleges jurisdiction pursuant to the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. § 2805.[1] Exxon alleges federal question jurisdiction pursuant to 28 U.S.C. § 1331 and jurisdiction pursuant to 28 U.S.C. § 1337.

On 13 February 1991, Exxon filed a motion for a temporary restraining order and a preliminary injunction to restrain and enjoin Glenside from continuing to conduct its service station business on Exxon's property located at 2591 Route 22, Scotch Plains, New Jersey (the "Service Station"), from continuing to maintain possession of the Service Station, from communicating with or coming within close proximity to Exxon employees Anthony Luciano ("Luciano") and William Cruikshank ("Cruikshank") and from coming within close proximity of the Service Station and Exxon's Linden, New Jersey offices and facilities (the "Linden Offices"). In addition, Exxon moved to supplement its counterclaims to include the criminal convictions of Robert E. Lee, Jr. ("Lee"), the president and sole shareholder of Glenside, as a ground for terminating the franchise relationship under the PMPA, 15 U.S.C. § 2802.

Oral argument on Exxon's motion for injunctive relief and to supplement counterclaims was held on 25 February 1991.[2] In a decision announced from the bench on that date, the Exxon request to enjoin Glenside from continuing to conduct the Service Station business and from continuing to maintain possession of the Service Station was rejected. It was determined such injunctive relief was not appropriate at that time because it would effectively dispose of the case on the merits by terminating the franchise business. The parties were advised such injunctive relief was more appropriately the subject of a motion for summary judgment.

The Exxon motion for an injunction restraining Lee, the president and sole shareholder of Glenside, from coming within one hundred yards of the Linden Offices, the Service Station and Exxon employees Luci-

---

1. Section 2805 provides in relevant part:
   **Maintenance of a civil action by franchisee against franchisor; jurisdiction and venue; time for commencement of action**
   (a) If a franchisor fails to comply with the requirements of section 2802 or 2803 of this title, the franchisee may maintain a civil action against such franchisor. Such action may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in

   which the principal place of business of such franchisor is located or in which such franchisee is doing business....
   15 U.S.C. § 2805(a).

2. Because it was determined Glenside had sufficient opportunity to respond to Exxon's motion for injunctive relief, oral argument was not confined to the request for a temporary restraining order, but concerned a preliminary injunction.

ano and Cruikshank was granted. *See* Oral Arg. Tr. at 2–9. In addition, Exxon was permitted to supplement its counterclaims pursuant to Fed.R.Civ.P. 15(d) to include the convictions of Lee as a ground for termination under the PMPA. *Id. See also* 26 February 1991 Order; 28 February 1991 Order.

Exxon now moves for partial summary judgment on the issue of the lawfulness of Exxon's termination of the Franchise Agreement under the PMPA, 15 U.S.C. § 2802. In addition, Exxon renews its application for injunctive relief to enjoin Glenside from operating and from maintaining possession over the Service Station, as requested in its counterclaims.[3] Oral argument on Exxon's motion for partial summary judgment and on its application for permanent injunctive relief was held on 22 March 1991 (the "22 March 1991 Oral Argument").

For the reasons which follow, the motions for partial summary judgment and for permanent injunctive relief are granted. In addition, the reasons for the 25 February 1991 determination enjoining Lee from approaching the Service Station, the Linden Offices and Luciano and Cruikshank and permitting Exxon to supplement its counterclaims are set forth. Finally, the preliminary injunction enjoining Lee from approaching the Service Station, the Linden Offices and Luciano and Cruikshank is converted to a permanent injunction.

*Facts*[4]

Glenside, through Lee, entered into a franchise relationship with Exxon sometime around April 1985 for the operation of the Service Station. Amended Complaint at 5–6. The franchise relationship was based on a lease agreement (the "Lease Agreement") and retail sales agreement (the "Sales Agreement") between the Par-

---

3. With respect to its motion for injunctive relief, Exxon submitted: the Memorandum in Support of Motion of Defendant–Counterclaimant Exxon Company, U.S.A. for Temporary Restraining Order, Order to Show Cause and Preliminary Injunction, and all exhibits attached thereto; and the Reply Memorandum in Support of Defendant–Counterclaimant Exxon Company, U.S.A. for Temporary Restraining Order, Order to Show Cause and Preliminary Injunction.

In opposition to the initial motion for injunctive relief, Glenside submitted: the Brief in Opposition to Motion of Exxon Company, U.S.A. for Temporary Restraining Order, Order to Show Cause and Preliminary Injunction (the "Glenside PI Opposition Brief"); the Certification of William M. Boyle, and all exhibits attached thereto; the Certification of Robert E. Lee, Jr. (the "First Lee Cert."); and the Certification of Robert Lombard.

With respect to the motion to supplement its counterclaims, Exxon submitted the Verified Supplemental Counterclaims of Exxon Company, U.S.A.; and the Motion of Defendant–Counterclaimant Exxon Company, U.S.A. to Supplement Counterclaims.

In opposition to the motion to supplement Exxon's counterclaims, Glenside submitted a letter dated 14 February 1991 (the "14 February 1991 Glenside Letter to the Court").

In support of its motion for partial summary judgment, Exxon submitted the Memorandum in Support of Motion of Defendant–Counterclaimant Exxon Company, U.S.A. for Partial Summary Judgment (the "Exxon SJ Moving Brief"), and all exhibits attached thereto, including the Declaration of Sharon Haggerty (the "Haggerty Dec."), attached as Exhibit A, ex-

cerpts from the transcript of the deposition of Robert E. Lee, Jr. (the "R. Lee Dep. Tr."), attached as Exhibit 2, excerpts from the deposition transcript of Dorothy J. Lee (the "D. Lee Dep. Tr."), attached as Exhibit 3, and excerpts from the deposition transcript of Anthony J. Luciano, attached as Exhibit 4; and the Reply Memorandum in Support of Motion of Defendant–Counterclaimant Exxon Company, U.S.A. for Partial Summary Judgment.

In opposition to the motion for partial summary judgment, Glenside submitted the Brief in Opposition to Motion of Exxon Company, U.S.A. for Partial Summary Judgment (the "Glenside SJ Opposition Brief"), and all exhibits attached thereto; the Certification of William M. Boyle, and all exhibits attached thereto; the Certification of Robert E. Lee, Jr. (the "Second Lee Cert."); and the Certification of Carl J. Herman, Esq. (the "Herman Cert."), and all exhibits attached thereto, including the statement of Rosalie Marrone (the "Marrone Statement"), attached as Exhibit A.

Also relevant is the transcript of oral argument held on 25 February 1991 (the "Oral Arg. Tr."), the Order, dated 26 February 1991, granting certain injunctive relief (the "26 February 1991 Order") and the Order, dated 28 February 1991, permitting Exxon to supplement its counterclaims (the "28 February 1991 Order").

4. The facts underlying the dispute are set forth in greater detail in the decision granting Exxon's motion to dismiss, *Glenside West Corporation v. Exxon Company, U.S.A., a Division of Exxon Corporation*, No. 90–1333 (D.N.J. 21 February 1991).

ties which authorized Glenside to use Exxon's trade mark in connection with the sale, consignment or distribution of gasoline, motor oil and related products (the Lease Agreement and Sales Agreement are collectively referred to as the "Franchise Agreement"). Amended Complaint at 6. The Parties renewed the Franchise Agreement on or about 27 September 1987 for the period 1 January 1988 to 1 January 1991. Amended Complaint at 8.

On or around 4 January 1990, Glenside received notice from Exxon of Exxon's intention to terminate and not renew the Franchise Agreement effective 15 April 1990. Amended Complaint at 2. Exxon based its decision to terminate on Glenside's failure to make timely rental payments for October and November 1989 and on Lee's alleged threat to injure Exxon's personnel and damage its property. Amended Complaint.

On 3 April 1990, Glenside filed its Complaint for Preliminary and Permanent Injunction, seeking to enjoin Exxon from terminating the Franchise Agreement. *See* Complaint for Preliminary and Permanent Injunction (the "Complaint"). It withdrew its request for a preliminary injunction on 31 May 1990 and filed the Amended Complaint on 10 August 1990. *See* Amended Complaint. The Amended Complaint now contains six counts.[5] Count One alleges Exxon seeks to terminate the Franchise Agreement with Glenside in violation of the PMPA, 15 U.S.C. § 2802. The remaining

counts appear to be based on violations of New Jersey law.[6]

Exxon filed its Answer and Counterclaim on 30 April 1990, its Answer to Amended Complaint and Counterclaims on 31 August 1990, and, with the consent of Glenside, the Supplemental Answer to Amended Complaint and Counterclaims on 28 December 1990 (the "Supplemental Counterclaims"). In Count I (the "First Counterclaim") of the Supplemental Counterclaims, Exxon alleges the failure of Glenside to make timely rental payments for the months September 1988 and April, October and November 1989, August, September, October, November and December 1990 and threats by Glenside against Exxon's personnel and property constitute grounds for termination and nonrenewal pursuant to 15 U.S.C. §§ 2802(b)(2)(A), 2802(b)(2)(B) and/or 2802(b)(2)(C) and 2802(c)(8). In Count II (the "Second Counterclaim"), Exxon alleges it was entitled to possess the Service Station on 15 June 1990 under the terms of the Lease Agreement and seeks of eviction of Glenside pursuant to its terms. In Count III, Exxon alleges Glenside owes Exxon in excess of $13,000 for rent and other items. Exxon seeks declaratory relief that its termination and nonrenewal of the Franchise Agreement were lawful under the PMPA, injunctive relief enjoining Glenside from continuing to occupy and refusing to vacate the Service Station, a judgment against Glenside for the

---

**5.** On 21 February 1991, Exxon's motion to dismiss Counts Two, Five, Six, Eight, Eleven and Twelve was granted. *See Glenside West Corporation v. Exxon Company, U.S.A., a Division of Exxon Corporation,* No. 90–1333 (D.N.J. 21 February 1991). Following that decision, only six of Glenside's original twelve counts set forth in the Amended Complaint remain.

**6.** As stated previously, aside from Count One, only Counts Three, Four, Seven, Nine and Ten remain following the previous granting of Exxon's motion to dismiss. Count Three alleges that agents and employees of Exxon continuously harassed Glenside by insisting that it abandon its automotive repair and towing services. In Count Four, Glenside complains that its employees were continuously harassed by Exxon's employees and agents, who misrepresented to them that they should seek other employment be-

cause Exxon may be unable to renew the lease or to purchase the Service Station property. In Count Seven, Glenside alleges Exxon's "business counselors" were negligent in the advice they gave Glenside as to what inventory to purchase. In Count Nine, Glenside alleges Exxon promised a reduction in Glenside's monthly rent in consideration for a reduction in Glenside's retail motor fuel prices and that Glenside suffered harm from the reduction made in its retail motor fuel counselors. Finally, in Count Ten, Glenside alleges Exxon's "business counselors" represented to Glenside Exxon would make a reduction in Glenside's monthly rent in consideration for a reduction in Glenside's retail motor fuel prices in reckless disregard of the truth. While the Amended Complaint does not explicitly say so, these counts appear to be based upon New Jersey law.

amounts due and owing and legal costs and attorneys' fees.

The allegation of threats by Lee against Exxon's personnel and property is partly based on threats made by Lee in a telephone conversation with Sharon Haggerty ("Haggerty"), the office manager for the office of Luciano, the Exxon district manager for the Linden district. Supplemental Counterclaims, ¶ 13. On 25 October 1989, Lee telephoned Luciano's office "clearly in a rage" and requested to speak with him. Haggerty Dec., ¶ 2. Haggerty informed Lee that Luciano was unavailable. Lee stated "he wanted to resolve his problems with Exxon and that if the problems were not resolved he would blow up Exxon's Linden plant and kill Exxon personnel, including Cruikshank, his business counselor, and Luciano." *Id.* Lee further informed Haggerty that he had run his wife and two children out of his house and that he had then destroyed everything in the house. *Id.* Haggerty spoke with Lee approximately thirty to forty minutes as she attempted, unsuccessfully, to calm Lee down. *Id.*[7]

In his deposition testimony, Lee did not deny having made such threats to Haggerty during that telephone conversation. Rather, he stated he did not remember the content of that conversation because he was "drunk, intoxicated" at the time, having drunk "[a] lot" of "beer, whiskey, everything ..." over a full day. R. Lee Dep. Tr. at 46. In her deposition testimony, Dorothy Lee, Lee's spouse, testified Lee admitted to her the day following the 25 October 1989 telephone conversation he had threatened to blow up Linden's Exxon plant:

Q. You testified that the day after the October 25, 1989 phone call, Mr. Lee told you what he said to Exxon; correct?

A. Correct.

Q. And he told you that he had said that he was going to blow up Exxon's Linden, New Jersey, plant; correct?

A. Correct.

Q. Did Mr. Lee express my [sic] remorse about having made that telephone call?

A. Yes. He said that he shouldn't have said that, that he said it because he was mad, and plus he had the drinks in him, and he shouldn't have said that, and I said it too, "You shouldn't have said that," and he also said, "Why did I say that? That was a stupid thing for me to say."

D. Lee Dep. Tr. at 73.[8]

Exxon served Glenside with a second notice of termination after it learned that Lee had been convicted on a three-count indictment on 7 February 1991. Following an incident unrelated to the operation of the Service Station, Lee was tried and convicted after a jury trial before the Hon. Betty J. Lester of the Superior Court of New Jersey, County of Essex, for third degree aggravated assault, possession of a weapon

---

**7.** At the 22 March 1991 Oral Argument, counsel for Glenside complained that because of scheduling problems arising out of Lee's criminal trial and Exxon's various dispositive motions, Haggerty has not yet been deposed as to the substance of her conversations with Lee on 25 October 1989. However, counsel for Glenside has not submitted an affidavit pursuant to Fed. R.Civ.P. 56(f) requesting that the instant summary judgment motion be stayed pending further discovery by Glenside, as conceded by counsel for Glenside at the 22 March 1991 Oral Argument. Glenside may not, therefore, avail itself of that argument to defeat summary judgment. *See, e.g., Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3d Cir.1989); *Dowling v. Philadelphia*, 855 F.2d 136, 139–40 (3d Cir.1988).

**8.** In an affidavit submitted to defeat Exxon's motion for a preliminary injunction, which is also deemed to be in opposition to the Exxon motion for partial summary judgment, Glenside submitted a certification from Lee in which Lee stated: "I ... dispute that I ever threatened Mr. Luciano's life or Mr. Cruikshank at any time when at my station. Indeed, my wife was even present during the argument with Mr. Cruikshank of which he has testified and she can recall no threatening behavior whatever on my part." First Lee Cert., ¶ 4. Lee did not deny in this certification that he threatened to blow up Exxon's Linden plant. To the extent the affidavit contradicts his sworn testimony, Glenside cannot rely on it to defeat summary judgment. *See Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 705 (3d Cir.1988); *Vanguard Telecommunications, Inc. v. Southern New England Telephone Co.*, 722 F.Supp. 1166, 1170 n. 2 (D.N. J.1989), *aff'd*, 900 F.2d 645 (3d Cir.1990).

and possession of a weapon for an unlawful purpose. Herman Cert., ¶ 2.[9]

It appears the conviction of Lee arises from events occurring on 15 December 1989 at the Fireside Inn, a tavern owned by Lee's father and located in Newark, New Jersey. Second Lee Cert., ¶ 3. According to Carl J. Herman ("Herman"), counsel for Lee in the criminal proceedings, Lee was convicted based on the testimony of Rosalie Marrone ("Marrone"), a patron of the tavern, as to an altercation between a patron of the tavern, Frank Giacone ("Giacone"), Lee's brother, Billy Lee ("Billy"), and Lee. Herman Cert., ¶ 5. Herman states Marrone "testified essentially that Mr. Lee kicked Mr. Giacone once in the body and further hit him once with a pipe in the body area when Mr. Giacone was lying in a prone position on the floor after being assaulted by Billy Lee." Herman Cert., ¶ 5.

Herman attaches to his certification the statement Marrone gave the police, in which Marrone stated:

> [Giacone] then went down on the first blow to the head. Billy was ranting "I'll kill, I'll kill, Do you want to see me go crazy. I'll go crazy." As he was ready to hit Frank Giacone for the second time I tried to get up and help him ... I saw Billy hit Frank for the second time. Billy was then ready to hit him for the third time when I leaped towards Billy to stop him from hitting Frank, and the bat hit me. Then when I was leaning down to see Frank, Billy hit him for a third time in the head.... There was so much commotion going on.... Bobby, Jr. [Lee] then walked over to where [Giacone] was lying and hit his body with a pipe and kicked him and called him a

"... jerk off." Then they proceeded to leave the scene of the crime.

*See* Marrone Statement. Counsel for Exxon represents that testimony at trial included testimony from Giacone's doctor that "as a result of the attack, Mr. Giacone has suffered severe and permanent injuries." Exxon PI Moving Brief at 5. Counsel for Glenside did not deny at the 22 March 1991 Oral Argument that such medical testimony took place at the criminal trial or that Giacone suffered "severe and permanent injuries."

Upon learning of Lee's 7 February 1991 convictions, Exxon notified Glenside the Franchise Agreement would be terminated immediately. Exxon SJ Moving Brief at 1. In addition, as stated previously, on 13 February 1991 Exxon filed a motion for injunctive relief to enjoin Glenside from continuing to operate the Service Station and from maintaining possession of the premises and to restrain Lee from coming within one hundred yards of the Service Station, the Linden Offices and Luciano and Cruikshank. Exxon also sought leave to supplement its counterclaims by filing the Verified Supplemental Counterclaims, which added the convictions of Lee as a ground for termination under the PMPA, 15 U.S.C. § 2802 (the "Verified Supplemental Counterclaims"). As stated, Exxon was granted leave to file the Verified Supplemental Counterclaims and injunctive relief to the extent of restraining Lee from coming within one hundred yards of the Service Station, the Linden Offices and Luciano and Cruikshank in a decision announced from the bench on 25 February 1991. The Verified Supplemental Counterclaims were approved by the 28 February 1991 Order.[10]

---

**9.** Lee is to be sentenced on 5 April 1991. *Id.*

**10.** Glenside did not submit papers in opposition to Exxon's motion to supplement its counterclaims. Instead, it submitted a letter, dated 14 February 1991, in which it stated: "[I]t is ... our understanding that Exxon's motion to supplement its counterclaims, served simultaneously with the [motion for injunctive relief] will neverthless [sic] be heard via Your Honor's dispositive motion procedure rather than on an emergent basis as there exists absolutely no reason for same to be heard other than the normal course. Glenside intends to request a

severance of Exxon's most recent basis for termination, namely Mr. Lee's February 7, 1991 conviction, as same is not relevant to the prior termination and immensely prejudicial." *See* 14 February 1991 Glenside Letter to the Court.

Contrary to the suggestion of Glenside that the motion to supplement the counterclaims should have been handled pursuant to the dispositive motion procedure, motions to supplement pleadings are not handled pursuant to the procedure employed by this court for dispositive motions, but are handled pursuant to the

The First Counterclaim of the Verified Supplemental Counterclaims adds Lee's convictions as a ground for termination of the Franchise Agreement under the PMPA, 15 U.S.C. §§ 2802(b)(2)(C) and (c)(12).[11] In addition, the Verified Supplemental Counterclaims reiterate Exxon's prayer for declaratory relief that the termination and nonrenewal of the Franchise Agreement was lawful under the PMPA, for injunctive relief enjoining Glenside and its agents from continuing to occupy and refusing to vacate the Service Station and for entry of judgment against Glenside for amounts due and owing to Exxon.

Exxon now moves for partial summary judgment on the issue of the lawfulness of the termination of the Franchise Agreement in light of Lee's convictions, or on Count One of the Amended Complaint and on its First Counterclaim.[12] Exxon argues summary judgment on this issue should be granted because there is no genuine issue of material fact as to the nature of Lee's convictions and because the convictions constitute sufficient grounds for termination under the PMPA. Exxon asserts the convictions are grounds for termination under 15 U.S.C. § 2802(b)(2)(C), which provides for termination upon the occurrence of any event "relevant to the franchise relationship," and under 15 U.S.C. § 2802(c)(12), which permits termination upon the conviction of the franchisee of a crime involving "moral turpitude." 15 U.S.C. §§ 2802(b)(2)(C), (c)(12). Exxon contends that whether a crime involves moral turpitude should be determined exclusively with reference to the statutory elements which must be satisfied in order to obtain a conviction, not with reference to the underlying crime. Exxon argues that under such an analysis, a conviction for third degree aggravated assault, as a crime having as an element the intent to cause bodily harm, is a crime involving moral turpitude. The termination being lawful, Exxon thus asserts it is entitled to partial summary judgment and to the injunctive relief requested in the Supplemental Counterclaims.

In opposition to partial summary judgment, Glenside asserts the conflicting positions that the determination of whether a crime involves moral turpitude should be made with reference to the elements only[13] and also that it should be determined with reference to the underlying facts. Glenside SJ Opposition Brief at 11. With respect to its position that moral turpitude must be determined by looking at the statutory elements, Glenside argues third degree aggravated assault is not a crime involving moral turpitude because it does not have as an element the intent to cause bodily harm, but only requires a showing of "reckless behavior or attempt." Glenside SJ Opposition Brief at 10. With respect to its position that the moral turpitude of a crime must be determined with reference to the underlying facts, Glenside

usual court procedure. *See* Local Rules, Appendix 2.

11. The Verified Supplemental Counterclaims also state that the convictions were grounds for termination under subsections 2802(c)(1), (c)(8) and (c)(11). Because it is determined the convictions were grounds for termination under subsections 2802(c)(12) and (b)(2)(C), it is unnecessary to address whether they were also grounds under subsections 2802(c)(1), (c)(8) and (c)(11).

12. While Exxon states only that it moves "for partial summary judgment on the lawfulness of Exxon's termination of the franchise of plaintiff-counterdefendant Glenside West Corporation," *see* Notice of Motion of Defendant–Counterclaimant Exxon Company, U.S.A. for Partial Summary Judgment, it appears that as to the Amended Complaint, only Count One relates to the lawfulness of the termination under the PMPA. It appears the remaining counts are based on New Jersey law. *See supra* at n. 6. As to Exxon's counterclaims, it appears only the First Counterclaim raises the legality of the termination. The Second Counterclaim is an eviction claim based on the terms of the Lease Agreement and the Third Counterclaim is a claim for amounts owing Exxon under the Sales and Lease Agreements. Exxon's motion for partial summary judgment is therefore deemed a motion for summary judgment on Count One of the Amended Complaint and on its First Counterclaim.

13. Glenside states: "Exxon and Glenside agree that the court is constrained to review solely the statutory elements of the crime in its determination of whether moral condemnation may properly be invoked." Glenside SJ Opposition Brief at 18.

argues that intent to cause bodily injury is not in itself enough for a determination that a crime involves moral turpitude, given the intent may be justified under certain circumstances, as where self-defense is asserted. *Id.* at 11.[14]

In support of its position that the underlying facts should be reviewed, Glenside submits the affidavit of Lee. Lee asserts: "On [15 December 1989] I was present with my mentally-retarded brother Billy and engaged in a heated verbal argument with my own father, the operator of the tavern, over personal affairs and he ordered me to leave the premises. I complied and my brother accompanied me." Second Lee Cert., ¶ 4. Lee asserts Giacone pursued him as he was leaving the tavern and kicked him, "apparently endeavoring to assist [his] father" in ejecting him from the tavern. *Id.,* ¶ 5. Lee states Billy then picked up a baseball bat from the vestibule of the tavern and reentered the tavern in pursuit of Giacone. *Id.* Lee asserts he followed Billy into the tavern to "retrieve" him. *Id.,* ¶ 9. Lee states: "I believe my reentering the bar to retrieve my brother was misconstrued as an attempt to commit an assault in concert with my brother." *Id.,* ¶ 12.

Lee states he "never once struck Mr. Giacone...." *Id.,* ¶ 17. He states he did not testify at trial out of concern that his testimony would result in the conviction of Billy. *Id.,* ¶ 11.[15]

In addition, Glenside submitted the certification of Herman to defeat summary judgment. Herman asserted:

Mr. Lee's ... convictions stem solely from the testimony of one Rosalie Marrone, who testified essentially that Mr. Lee kicked Mr. Giacone once in the body and further hit him once with a pipe in the body area when Mr. Giacone was lying in a prone position on the floor after being assaulted by Billy Lee. No one else present at the time of the incident corroborated Ms. Marrone's testimony, though many others were present, and Mr. Giacone, himself, never once testified to being struck at all by Robert E. Lee, Jr.

Herman Cert., ¶ 6. Apparently, the jury accepted Marrone's testimony as credible.

*Discussion*

A. Standard of Review

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Electric Industrial Co. v.*

---

**14.** In addition, Glenside argues partial summary judgment should not be granted because Exxon did not submit evidence proving the convictions of Lee. Such argument carries no weight in light of Glenside's repeated concessions as to the convictions. *See* Glenside SJ Opposition Brief at 3 ("[Lee] was convicted on February 7, 1991 in New Jersey Superior Court, County of Essex, apparently for aggravated assault, third degree and other lesser included charges stemming from an incident unrelated to the franchise relationship...."); Herman Cert., ¶ 2 ("On February 7, 1991, after jury trial before the Honorable Betty J. Lester, JSC, in the Superior Court of New Jersey, County of Essex, Mr. Lee was convicted of third degree aggravated assault, possession of a weapon and possession of a weapon for an unlawful purpose."); Second Lee Cert., ¶ 3 ("My convictions for aggravated assault, possession of a weapon and possession of a weapon

for an unlawful purpose stem from an incident occurring on or about December 15, 1989 at the Fireside Inn, a tavern located in Newark, New Jersey."); Glenside PI Opposition Brief at 3 ("[Lee] was convicted on February 7, 1991 in New Jersey State Court, County of Essex, apparently for aggravated assault, third degree and other lesser included charges stemming from an incident unrelated to the franchise relationship and occurring in a Newark, New Jersey tavern operated by Mr. Lee's father."); First Lee Cert., ¶ 11 ("My February 7, 1991 conviction for aggravated assault is presently subject to appeal and sentencing is scheduled for early March 1991.").

**15.** The jury convicted Billy of second degree aggravated assault. Herman Cert., ¶ 3. Billy is also awaiting sentencing. *Id.*

*Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also Todaro v. Bowman,* 872 F.2d 43 (3d Cir.1989); *Joseph v. Hess Oil,* 867 F.2d 179, 182 (3d Cir.1989).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted).

The court elaborated on the standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted). Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing the need for trial. *See* Fed.R.Civ.P. 56(e). *See also Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case.").

## B. Termination under the PMPA

The PMPA strikes "a delicate balance between the interests of the participants in a petroleum marketing franchise relationship." *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1220 (7th Cir.1982). Congress enacted the PMPA in 1978 in "recognition of the 'disparity of bargaining power which exists between the franchisor and the franchisee' in the gasoline industry." *Rodgers v. Sun Refining and Marketing Co.,* 772 F.2d 1154, 1158 (3d Cir.1985) (quoting *Sun Refining and Marketing Co. v. Rago,* 741 F.2d 670, 672 (3d Cir.1984)). Congress recognized franchisors "risk losing completely the return from their prior investments, and potentially their livelihood, if their franchise agreements are terminated," and that franchisors "used their superior bargaining power and the threat of termination to gain an unfair advantage in contract disputes." *O'Shea v. Amoco Oil Co.,* 886 F.2d 584, 587 (3d Cir.1989) (citing *Slatky v. Amoco Oil Co.,* 830 F.2d 476, 478 (3d Cir.1987)). The PMPA was intended to protect franchisees from exploitation by large petroleum companies. *O'Shea,* 886 F.2d at 587 (citing S.Rep. 731, 95th Cong.2d Sess. 17–18, *reprinted in* 1978 U.S.Code & Admin.News 873, 875–77).

The PMPA accomplishes this purpose primarily by limiting the grounds on which distributors may terminate or fail to renew the franchise. *See* 15 U.S.C. § 2802.[16]

---

**16.** Section 2802 provides in relevant part:
**Franchise Relationship**
**General prohibition against termination or nonrenewal**
(a) Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise ... prior to the conclusion of the term, or the expiration date, stated in the franchise; or
(2) fail to renew any franchise relationship.
**Precondition and grounds for termination and nonrenewal**
(b)(1) Any franchisor may terminate any franchise ... or may fail to renew any franchise relationship, if—

Other than as provided therein, the PMPA makes it illegal for a franchisor to terminate or to refuse to renew a franchise. 15 U.S.C. § 2803(a). As exceptions to this general rule, the PMPA provides a number of grounds on which a franchisor may terminate or fail to renew a franchise. 15 U.S.C. § 2802. As one of the grounds, termination or nonrenewal of a franchise agreement is permitted "upon the occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable...." 15 U.S.C. § 2802(b)(2)(C). The PMPA provides a nonexhaustive list of examples of such occurrences, including "conviction of the franchisee of any felony involving moral turpitude." 15 U.S.C. § 2802(c)(12).

As a condition of termination or nonrenewal, the PMPA provides guidelines the franchisor must follow in notifying the franchisee of its decision to terminate or nonrenew the franchise. The PMPA requires franchisees to provide notice of termination or nonrenewal to the franchisee at least ninety days before the effective date of the termination or nonrenewal. 15 U.S.C. § 2804(a)(2). However, "[i]n circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than [ninety] days prior to the date on which termination or nonrenewal takes effect, ... such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable...." 15 U.S.C. § 2804(b)(1)(A).

In support of its motion for summary judgment, Exxon argues the convictions of Lee are sufficient grounds for termination under subsection 2802(c)(12). In addition, it argues subsection 2802(c) provides a nonexhaustive list of "event[s] ... relevant to the franchise relationship," 15 U.S.C. § 2802(b)(2)(C), and the convictions of Lee are grounds for termination as relevant non-enumerated events under subsection 2802(b)(2)(C).

As to Exxon's assertion that termination of the Franchise Agreement is permitted under subsection 2802(c)(12), several courts have observed there are various ways of analyzing whether a crime may be characterized as one involving moral turpitude. *See Portaluppi v. Shell Oil Co.*, 684 F.Supp. 900, 903 (E.D.Va.1988), *aff'd*, 869 F.2d 245 (4th Cir.1989); *In re Conduct of Chase*, 299 Or. 391, 398–400, 702 P.2d 1082, 1086–87 (1985). These approaches include looking at the statutory elements and definition of the crime and looking at the underlying circumstances of the crime. *Id.* The parties have pointed to no New Jersey decisions identifying which approach is to be used in evaluating crimes under New Jersey law, nor does any such authority appear to exist. In addition, it does not appear that decisions under the PMPA, 15 U.S.C. § 2802(c)(12), assign a method of analysis.

---

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship....

(B) A failure of the franchisee to exert good faith efforts to carry out the provisions of the franchise, if—

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions....

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable....

**Definition**

(c) As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as—

(12) conviction of the franchisee of any felony involving moral turpitude.

15 U.S.C. § 2802.

■ As pointed out by both Exxon and Glenside, the Immigration and Nationality Act, which permits deportation of an alien upon conviction for a crime involving moral turpitude, 8 U.S.C. § 1251(a)(4), provides analogous authority on the question of how to determine whether a crime is a crime involving moral turpitude. *See* Exxon SJ Moving Brief at 7; Glenside SJ Opposition Brief; Glenside PI Opposition Brief at 12–13. Under the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(4), the nature of the alien's crime is determined by the "statute and record of conviction, not from the specific acts surrounding the conviction." *Alleyne v. United States Immigration and Naturalization Service*, 879 F.2d 1177, 1185 (3d Cir.1989) (citing *Okabe v. Immigration and Naturalization Service*, 671 F.2d 863, 865 (5th Cir.1982); *McNaughton v. Immigration and Naturalization Service*, 612 F.2d 457, 459 (9th Cir.1980); *Castle v. Immigration and Naturalization Service*, 541 F.2d 1064, 1066 n. 5 (4th Cir.1976)). Based on such analogous federal authority, it appears the proper analysis under the PMPA is to ascertain whether the statutory elements and definition of a crime warrant characterizing the crime as a crime involving moral turpitude. In addition, as stated previously, Exxon argues, and Glenside concedes, the analysis as to whether a conviction is for a crime involving moral turpitude depends on the statutory definition and elements of the crime, not the underlying circumstances.[17]

■ Among Lee's convictions was a conviction for third degree aggravated assault, N.J.S.A. 2C:12–1. New Jersey statutory authority defines this crime as follows: "A person is guilty of aggravated assault [in the third degree] if he ... [a]ttempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon." N.J.S.A. 2C:12–1(b)(2). The statutory definition of this crime involves scienter or intent to cause bodily harm with a weapon which may cause death.[18]

Courts have held that where a crime requires proof of intent to cause bodily injury, such crime involves moral turpitude. *See e.g., People v. Miranda*, 184 Ill.App.3d 718, 720, 133 Ill.Dec. 142, 143, 540 N.E.2d 1008, 1009 (1989), *appeal denied*, 127 Ill.2d 631, 136 Ill.Dec. 599, 545 N.E.2d 123 (1989) (aggravated assault is a crime of moral turpitude); *People v. Elwell*, 206 Cal. App.3d 171, 176–177, 253 Cal.Rptr. 480, 483 (1988) (aggravated assault is a crime of moral turpitude, given "anyone who unlawfully attempts to injure another by means of force ... is guilty of some degree of moral laxity."); *People v. Thomas*, 206 Cal. App.3d 689, 694–695, 254 Cal.Rptr. 15, 18 (1988) ("[U]se of the weapon permits the inference that the actor realized the likelihood of injuring the other person and therefore demonstrated a readiness to do evil...."). On 7 February 1991, Lee was convicted of third degree aggravated assault, a conviction which depended on a finding beyond a reasonable doubt by the

**17.** While Glenside argues such is the proper analysis, it argues at other points in its submissions that the proper analysis of whether a crime involves moral turpitude requires that the underlying facts be reviewed. In support of this latter position, Glenside relies heavily on *United States ex rel. Griffo v. McCandless*, 28 F.2d 287 (E.D.Pa.1928). *McCandless* is a 1928 district court case decided under section 19 of the Act of 5 February 1917, 8 U.S.C. § 155, apparently the 1928 analogue to 8 U.S.C. § 1251(a)(4). In *McCandless*, the court considered the deportability of an alien who was convicted for assault and battery under the statutory provision allowing deportation upon conviction of a crime involving moral turpitude. The *McCandless* court held the determination of whether the conviction of an alien is for a crime involving moral turpitude so as to warrant deportation under 8 U.S.C. § 155 could not be made without reference to the underlying facts. *Id.* at 288. How-

ever, it appears the approach of the *McCandless* court has been replaced by the analysis used in recent circuit court decisions under the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(4) requiring reference only to the elements of the crime for which the alien was convicted. *See Alleyne*, 879 F.2d at 1185 (citing cases).

**18.** As pointed out by Exxon, that the language of this statute requires a showing of intent, and not recklessness as argued by Glenside, is clear when it is contrasted to the statutory language of the provision on fourth degree aggravated assault, which provides: "A person is guilty of [fourth degree aggravated assault] if he ... *[r]ecklessly* causes bodily injury to another with a deadly weapon." N.J.S.A. 2C:12–1(b)(3) (emphasis added).

jury that Lee intended to cause bodily injury with a deadly weapon.

Lee was convicted of a crime involving moral turpitude.

Because Lee was convicted of a crime involving moral turpitude, such conviction was and is a ground for termination of the Franchise Agreement under subsection 2802(c)(12). The mere fact of Lee's conviction and the nature and elements of the crime for which he was convicted warranted termination under the PMPA. *See Atlantic Richfield Co. v. Guerami*, 820 F.2d 280, 283 (9th Cir.1987) (in finding conviction for distributing cocaine justified termination under 2802(c)(12), court stated it was "not called upon to determine whether a [crime] was serious enough to warrant termination. Congress has made that decision already in specifying events as to which termination is proper, among which is a conviction of the type sustained by [the franchisee]."); *Humboldt Oil Co. v. Exxon Co.*, 695 F.2d 386, 389 (9th Cir.1982) (the PMPA "explicitly provides that a conviction for a felony involving moral turpitude is the kind of event that is a reasonable cause for termination. Congressional intent could not be clearer."). Glenside has not raised a genuine issue of material fact so as to defeat summary judgment by submitting certifications attesting to Lee's innocence when Lee has already been found guilty beyond a reasonable doubt of a crime involving moral turpitude.

That Lee may appeal his conviction does not alter this result. As more than one court has observed, the simple language of subsection 2802(c)(12) makes termination proper upon the mere conviction of the franchisee, even if the conviction later proves to have been erroneous:

"Good faith belief of the franchisor that the franchisee is untrustworthy or engages in fraudulent practice undermines the entire franchise relationship. The Act does not provide a franchisee with total protection against termination but only with protection against unreasonable or arbitrary termination. The franchisee need not lose all possible appeals before the franchisor might reasonably think him untrustworthy."

*Lewis v. Exxon Corp.*, 716 F.2d 1398, 1399 (D.C.Cir.1983) (quoting *Humboldt Oil Co. v. Exxon Co.*, 695 F.2d 386, 389 (9th Cir. 1982)).

In addition, even if the convictions of Lee were not grounds for termination under subsection 2802(c)(12), they were events "relevant to the franchise relationship ... a result of which termination of the franchise ... [was] reasonable" under subsection 2802(b)(2)(C). *See* 15 U.S.C. § 2802(b)(2)(C). *See Portaluppi*, 684 F.Supp. at 905–06 ("[P]laintiff's conviction was an event relevant to the franchise relationship for all the same reasons ... that possession of cocaine is a felony involving moral turpitude."); *ARCO Petroleum Products Co. v. Williams*, 146 Ill.App.3d 218, 219–220, 100 Ill.Dec. 33, 34, 496 N.E.2d 1098, 1099 (1986) (franchisee's attack on ARCO driver was unenumerated relevant event).

Having learned that Lee was convicted for third degree aggravated assault, Exxon had cause for concern regarding Lee's fitness as a franchisee, the safety of its employees and property, especially in light of Lee's previous threats [19] and potential liability to patrons. In addition, while the underlying facts of Lee's convictions may not be considered in determining the lawfulness of the termination under subsection

---

19. As stated earlier, in an attempt to defeat partial summary judgment, Glenside submitted a certification of Lee in which he denied having threatened harm to Exxon employees in the 25 October 1989 telephone conversation with Haggerty. This certification contradicts earlier sworn testimony in which Lee stated he was unable to say whether, but did not deny, he threatened Exxon personnel and property. As stated previously, a party may not create an issue of material fact by submitting an affidavit of a witness which contradicts that witness' prior sworn testimony. *Martin*, 851 F.2d at 705; *Vanguard*, 722 F.Supp. at 1170 n. 2. Lee's certification therefore does not create a genuine issue of material fact with respect to his prior threats against Exxon personnel and property.

In addition, it is observed Lee does not deny threatening to blow up the Linden plant in his certification, submitted to defeat partial summary judgment.

2802(c)(12), they may be and are here considered in determining the relevance the convictions to the Franchise Agreement and whether the termination was lawful under subsection 2802(b)(2)(C).

Lee's own submissions reveal that testimony at the criminal trial included a description of Lee's participation in the beating of Giacone. In addition, counsel for Glenside did not dispute at the 22 March 1991 Oral Argument that Giacone's physician testified during the criminal proceedings that Giacone is severely and permanently injured as a result of the beating inflicted by Lee and Billy. Lee was found guilty beyond a reasonable doubt of participating in the beating of Giacone and was convicted for third degree aggravated assault. He may not defeat summary judgment by attempting to relitigate his guilt in this court. The convictions of Lee and the gravity of the conduct for which he was convicted were and are matters of legitimate concern to Exxon in light of Lee's potential threat to its personnel, property and to the public and warranted termination of the Franchise Agreement as a non-enumerated event under subsection 2802(b)(2)(C).

In addition, Exxon provided adequate notice of termination to Glenside following the convictions to render the convictions an adequate basis for termination. As stated, subsection 2804(b)(1)(A) permits a franchisor to provide a franchisee with less than ninety days notice of termination or nonrenewal "[i]n circumstances in which it would not be reasonable for the franchisor" to furnish this minimum amount of notice. 15 U.S.C. § 2804(b)(1)(A). In the instant case, Lee does not deny that on 25 October 1989 he threatened to kill two Exxon employees and blow-up Exxon's Linden plant. Lee's propensity for violence and dangerousness was affirmed when he was found guilty beyond a reasonable doubt on 7 February 1991 of aggravated assault in the third degree.

Certainly, once Lee was convicted of the charges against him Exxon was justified in immediately terminating the Franchise Agreement. It would have been unreasonable for Exxon to have done otherwise and to thereby subject its personnel and property and the public to potential harm and itself to potential liability. *Cf. ARCO*, 146 Ill.App.3d at 221, 100 Ill.Dec. at 35, 496 N.E.2d at 1100 (immediate termination was justified under the PMPA where franchisee allegedly attacked franchisor's driver who was attempting to make delivery). Courts have permitted termination following less than ninety days notice under substantially less compelling circumstances than those present in the instant case. *See, e.g., Abujudeh v. Mobil Oil Corp.*, 841 F.2d 310, 312 (9th Cir.1988) (less than ninety days notice permitted to prevent revocation of conditional use permit by municipality for franchisee's refusal to comply with conditions related to parking, illumination at night and landscaping); *Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1509 (6th Cir. 1989) (less than ninety days notice permitted for delinquent payments by franchisee); *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 61 (2d Cir.1984) (franchisor permitted to provide no notice where franchisee misbranded gasoline). Exxon was permitted under the PMPA to immediately terminate the Franchise Agreement upon learning of Lee's convictions.

For the foregoing reasons, summary judgment is granted in favor of Exxon on the issue of the lawfulness of the termination under the PMPA in light of Lee's convictions. Count One of the Amended Complaint is therefore dismissed, and judgment for Exxon is entered on the First Counterclaim.

In addition, because the sole question of federal law in the Amended Complaint and the Verified Supplemental Counterclaims, *i.e.*, the lawfulness of the termination under the PMPA, is resolved, no question of federal law remains in this action. The remaining claims of Glenside and Exxon are therefore dismissed in their entirety without prejudice for lack of subject matter jurisdiction. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Carney v. Dexter Shoe Co.*, 701 F.Supp. 1093, 1100 (D.N.J.1988) ("Where there ex-

ists no federal claim as a matter of law, the rationale for exercising pendant jurisdiction over state law claims generally does not apply.").

C. Permanent Injunctive Relief

Among the relief requested by Exxon in its counterclaims is permanent injunctive relief enjoining Glenside from continuing the Service Station business and from continuing to occupy the Service Station premises. The decision as to whether to grant permanent injunctive relief is left to the sound discretion of the trial court. *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). Permanent injunctive relief is an equitable remedy and will issue only " 'after a showing of both irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest.' " *Public Interest Research Group, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 82 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991) (quoting *Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.*, 906 F.2d 934, 941 (3d Cir.1990)). In addition, permanent injunctive relief will be granted "only where a threat of harm exists, not just where potential harm exists." *McLendon v. Continental Can Co.*, 908 F.2d 1171, 1182 (3d Cir.1990); *Roe v. Operation Rescue*, 710 F.Supp. 577, 588 (E.D.Pa.1989).

As stated previously, Lee had threatened to harm Exxon personnel and to blow up Exxon's Linden plant. Lee's propensity for violence and dangerousness was confirmed by his 7 February 1991 conviction for third degree aggravated assault, in which the underlying facts involve his participating in a beating which permanently injured the victim. Lee's conduct and convictions demonstrated him to be a threat to the physical well-being of Exxon personnel and of the public, as well as to Exxon property. Such harm is not recompensable through damages but is avoidable through the granting of permanent injunctive relief.

Lee is the president and sole shareholder of Glenside and is described in Glenside pleadings as Glenside's "alter ego." *See* Complaint at 5. Exxon, its employees and the public should not continue to be subjected to the threat posed to them by the continuation of the franchise relationship between Exxon and Glenside. Exxon is granted permanent injunctive relief and Glenside is hereby enjoined from continuing to operate the Service Station business and from maintaining possession over the Service Station premises. In addition, the preliminary injunction enjoining Lee from coming within one hundred yards of the Service Station, the Linden Offices and Luciano and Cruikshank is converted into a permanent injunction.

D. Preliminary Injunction Restraining Lee From Coming Within One Hundred Yards of the Service Station and Luciano and Cruikshank

As stated, Exxon is now granted permanent injunctive relief enjoining Glenside from continuing to operate the Service Station and from continuing to maintain possession over the premises. Also as stated, the preliminary injunction, restraining Lee from coming within one hundred yards of the Service Station, the Linden Offices and Luciano and Cruikshank, is converted to a permanent injunction. The preliminary injunction was granted in a decision announced from the bench on 25 February 1991 and confirmed by the 26 February 1991 Order, which stated the reasons for the preliminary injunction would be explained in an opinion to follow. The decision announced from the bench on 25 February 1991 granting the preliminary injunction was reached for the reasons set forth below.

In order to obtain a preliminary injunction, the Third Circuit has repeatedly held four factors must be considered: (1) the likelihood the applicant will prevail on the merits at a final hearing, (2) the extent to which the applicant is being irreparably harmed by the conduct sought to be enjoined, (3) the extent to which the granting of injunctive relief will irreparably harm the opponent of the injunctive relief and (4) the public interest. *Opticians Ass'n of*

*America v. Independent Opticians of America*, 920 F.2d 187, 191–92 (3d Cir. 1990); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197–98 (3d Cir.1990); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989). The failure by the applicant to show either a likelihood of success on the merits or irreparable injury must result in the denial of the application. *Hoxworth*, 903 F.2d at 197 (citing *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982)).

For the reasons set forth above, Exxon demonstrated a likelihood of showing termination was permitted under the PMPA in light of Lee's convictions. In addition, Exxon demonstrated a risk irreparable injury would ensue without such relief.

Courts have granted injunctive relief where the applicant for such relief shows he or she may be subjected to violence without injunctive relief. *Vazquez v. Carver*, 729 F.Supp. 1063, 1070 (E.D.Pa.1989) (prisoners who sought to enjoin overcrowding of prison facility showed irreparable harm by showing overcrowding exacerbated risk of inmate violence). A " 'history of tension or violence' ... justif[ies] the adoption of measures [which] will [prevent] violence.... Any activity that may threaten human life may be enjoined on the ground that a court of equity will not gamble with human life, at whatever odds, and on the ground that for loss of life there is no remedy that is, in an equitable sense, adequate." *Resident Advisory Bd. v. Rizzo*, 503 F.Supp. 383, 389 (E.D.Pa.1980) (quoting *Harris Stanley Coal & Land Co. v. Chesapeake & Ohio Ry. Co.*, 154 F.2d 450 (6th Cir.), *cert. denied*, 329 U.S. 761, 67 S.Ct. 111, 91 L.Ed. 656 (1946)).

Lee threatened to engage in acts of violence against Exxon personnel and property and even threatened to kill several Exxon employees in his telephone conversation with Haggerty on 25 October 1989. As mentioned, his capacity for actual violence and his dangerousness were confirmed when he was found guilty beyond a reasonable doubt of aggravated assault. Such circumstances clearly demonstrated Exxon's need for injunctive relief restraining Lee from approaching the Service Station, the Linden Offices and Luciano and Cruikshank. In addition, given Lee's position entailed contact with the public, and in light of Lee's prior threats against Exxon personnel and property, such injunctive relief was, and is, in the public interest. These factors balanced in favor of granting such injunctive relief.

## E. Amendment of the Supplemental Counterclaims

■ As stated previously, Exxon was granted leave to file the Verified Supplemental Counterclaims, which added Lee's convictions as grounds for termination under the PMPA, in a decision announced from the bench on 25 February 1991 and confirmed by the 28 February 1991 Order. The supplementation of the counterclaims was made pursuant to Fed.R.Civ.P. 15(d).[20] The decision to permit supplementation of the counterclaims was reached for the reasons which follow.

■ Requests to supplement pleadings are left to the sound discretion of the court. *Owens–Illinois, Inc. v. Lake Shore Land Co., Inc.*, 610 F.2d 1185, 1188–89 (3d Cir.1979); *United States v. Local 560*, 694 F.Supp. 1158, 1186 (D.N.J.), *aff'd without opinion*, 865 F.2d 253 (3d Cir.1988), *cert. denied*, 489 U.S. 1068, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1989); *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.*, 668 F.Supp. 906, 922 (D.Del.1987); *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.*, 98 F.R.D. 254, 276 (D.Del.1983). Rule 15(d) provides a court may permit a party to supplement pleadings to include "transactions or occurrences or events which have happened since the date of the pleading sought to be supple-

---

**20.** Rule 15(d) provides in relevant part:
   Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented.
   Fed.R.Civ.P. 15(d).

mented." Fed.R.Civ.P. 15(d). " 'The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed.' " *Coca–Cola Bottling Co. (II)*, 668 F.Supp. at 922 (quoting *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1057 (9th Cir.1981)). Such a motion should be denied only "where there is a finding of 'undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment . . .' " *Local 560*, 694 F.Supp. at 1186 (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)).

In the instant case, the convictions of Lee arose after the Supplemental Pleadings were filed on 28 December 1990. For the foregoing reasons, the convictions were clearly relevant to the underlying dispute over termination of the Franchise Agreement. Permitting Exxon to file the Verified Supplemental Counterclaims only promoted judicial economy by permitting the court to deal with the entire dispute at once, rather than in piecemeal fashion. *See Coca–Cola Bottling Co. (II)*, 668 F.Supp. at 923 ("[R]equests to supplement pleadings should be freely granted to permit the economic resolution of all related disputes between the parties.").

In addition, Glenside was not unduly prejudiced by the supplementation in light of the foregoing compelling reasons to allow supplementation and in light of the fact that eleven days transpired from when the Verified Supplemental Counterclaims were filed on 13 February 1991 to when the determination to allow the supplementation was reached on 25 February 1991. Glenside neglected to submit substantive opposition to the motion to supplement the counterclaims, even though it must have realized that because the motion for preliminary injunction was based on the criminal convictions and was scheduled for oral argument on 25 February 1991, so too must the motion to supplement the counterclaims have been scheduled for that date.

Apparently, Glenside failed to submit opposition to the motion to supplement in reliance on the assumption that motions to supplement pleadings are handled pursuant to this court's dispositive motion procedure. *See supra* at n. 10. Such oversight on Glenside's part did not mitigate against permitting the supplementation, especially in light of the fact that judicial economy weighed in favor of supplementation and in light of the fact that the decision to allow supplementation did not unduly prejudice Glenside.

*Conclusion*

For the foregoing reasons, summary judgment is granted in favor of Exxon on the issue of the legality of the termination of the Franchise Agreement under the PMPA in light of Lee's convictions. Count One of the Amended Complaint is therefore dismissed and judgment is entered in favor of Exxon on the First Counterclaim of the Verified Supplemental Counterclaims.

Accordingly, Exxon is entitled to a declaratory judgment that the termination of the Franchise Agreement was lawful under the PMPA. In addition, Exxon is granted permanent injunctive relief enjoining Glenside from continuing to operate the Service Station business and from continuing to maintain possession over the Service Station. The preliminary injunction enjoining Lee from coming within one hundred yards of the Service Station, the Linden Offices and Luciano and Cruikshank is converted to a permanent injunction.

In addition, because the federal causes of action are resolved, the remainder of the action is dismissed without prejudice.